S. S. McCONNELL, Receiver, ex rel., etc., v. JEANETTE B. HENOCHSBERG, et al.

Western Section. December 6, 1929.

Petition for Certiorari denied by Supreme Court, April 5, 1930.

Wilson, Gates & Armstrong, of Memphis, for appellant.
John Vorder Bruegge, H. E. Little and Holmes, Canale, Glankler & Loch, all of Memphis, for appellee.

SENTER, J. The appeal in this cause is from the decree of the Chancery Court in which the complainant in his capacity of Superintendent of Banks for the State of Tennessee, was decreed a recovery of certain life insurance on the life of Clarence Henochsberg and other personal property and also the pro rata part of the amount realized from the sale of the Henochsberg home in Memphis, on the theory that the premiums on the life insurance and certain securities and personal property and a portion of the purchase price of the real estate were paid out of the money stolen by Henochsberg from the American Savings Bank & Trust Company, of Memphis, while said Henochsberg was employed by said bank as assistant cashier.

The record consists of several volumes of pleadings and evidence and a great number of exhibits. After a thorough examination of the record we find that the facts as found by the Chancellor are supported by a preponderance of the evidence, and since the finding of the facts as found by the Chancellor meets our concurrence, we fully adopt the same, and which are as follows:

"FINDING OF FACTS:

"1. The Germania Savings Bank & Trust Company was organized in 1905, and soon became recognized as one of the strongest and safest, though not one of the largest, financial institutions in the city of Memphis, and it enjoyed this reputation throughout its entire history. During the war, for obvious reasons, its name was changed to the American Savings Bank & Trust Company. At the time of its failure in December, 1926, it had a paid up capital of $100,000 and a surplus of $123,000.

"2. Clarence Henochsberg had been in the employ of this bank for sixteen years and for a number of years was its assistant cashier, and one of the tellers; he was well known and popular and had a large following among the customers of the bank. In his capacity as assistant cashier, he had immediate supervision over the books, bookkeepers and tellers of the bank, and as one of the tellers he received and disbursed and handled large sums of money, the property and assets of said bank. He at all times had the confidence and esteem of the officers and directors of the bank, and especially Mr. Cohn, the president, and Mr. Dixon, the cashier, with both of whom he had much influence, so that it is argued with much reason that he was in reality the dominant figure in the bank.

"3. On December 2, 1926, while the State Bank Examiners were making their regular examination of the books of the bank, a shortage of approximately $105,000 was discovered in the ledgers and accounts kept by Rush H. Parke, a bookkeeper, having charge of the commercial accounts in the ledger 'A' to 'K.' As soon as the examiners appeared to examine the books, Parke fled. His shortage was ultimately found to be approximately $135,000 the bulk of which occurred in the accounts of Jessie Foltz and Foltz Suburban Markets. As a result of this discovery the examiners, I. H. Wilson and J. F. Hunt, demanded a thorough audit of the bank's books. Henochsberg vigorously opposed this audit on account of the great expense, but agreed that the directors should make good the Parke shortage, and offered to contribute the sum of $5000 in making up the shortage. The examiners, however, insisted the bank's having a thorough audit made, which would involve the bringing in of all the depositor's pass books for examination; and when this was refused by the officers and directors on December 6, the examiners gave notice that they

would themselves begin the making of such an audit on the following morning.

"4. On the night of December 2, after the discovery of the Parke shortage, Henochsberg, was greatly worried and told his wife that the bank would not be able to survive the loss, and that if the bank 'busted' they were ruined; he afterwards told Hunt, one of the tellers, that the bank would not be able to survive the loss; on the night of December 6, he confessed to his wife that he was $300,000 short; and told her that he had figured it out, and that the only thing left was for him to kill himself, and that if he did that she and the children could live on the income from his life insurance. At five o'clock the following morning he phoned to Abe Plough, wealthy depositor of the bank, and son-in-law of Harry Cohn, the president, and told him that he was $300,000 short; that the shortage would be revealed within five minutes after the auditors stepped into his cage; and that this was in addition to the Parke shortage; and he asked Plough to put up the $300,000 to save the bank; and Plough suggested that the situation ought to be laid before the board of directors and the money raised that way; at seven o'clock Henochsberg again called Plough and asked him to come over to see him, which Plough declined to do, again suggesting that the matter should be laid before the board of directors. Henochsberg declined to agree to this, and closed the conversation with the statement, that 'if you don't come over here with the money before eight o'clock, when the bell rings eight o'clock, you will know that I am dead.'

"5. On the morning of Tuesday, December 7th, at eight o'clock, Clarence M. Henochsberg committed suicide by (firing) a bullet through the brain. He left a memorandum in his own handwriting on the back of an envelope, headed 'all the accounts I can remember,' in which he made a partial list of his defalcations, which amounted to $244,595. This was evidently made from memory as indicated by the heading, and the amounts were approximated, as indicated by the use of the word 'about,' in connection with the amount.

"6. As soon as the announcement of Henochsberg's shortage and suicide became known the directors of the bank passed a resolution requesting the Superintendent of State Banks to take charge and wind it up as insolvent; so the bank did not open its doors on the morning of Tuesday, December 7. The examiners at once took charge and made a thorough and complete audit which revealed the fact that Henochsberg was short in his accounts at the time of the failure of the bank in the sum of $329,591.75.

"7. The method used by Henochsberg in stealing the funds of the bank was to receive deposits, enter them on the customers' pass books, and put the deposit slip in a private drawer or tear it up, so that no record of this deposit would appear on the depositors' ac-

count on the ledger. When checks were drawn against these deposits he would either make a fictitious deposit to cover them, or would pay them and drop the check in his private drawer so that they would not be entered on the depositor's account on the ledger. These thefts were generally in substantial amounts, and from accounts that were comparatively inactive, and from depositors whose dealings were almost exclusively with Henochsberg, and in many instances Henochsberg himself balanced the pass books of these depositors. By reason of this system it was necessary for the auditors to examine the pass books and check them against the ledger accounts. By this means the auditors have compiled a record filed as exhibit 'C' to the deposition of R. W. Hall, showing in accurate detail these deposits, which were entered in Henochsberg's handwriting in the depositors' pass books, and not entered on the bank's books, the dates and amounts of such deposits and the names of the depositors; the amounts restored to said accounts by fictitious deposits made by Henochsberg to take care of checks presented, with the dates and amounts thereof; the checks found in Henochsberg's private drawer which had been paid but not charged to the depositor's accounts; this exhibit shows a full and complete history of Henochsberg's shortage, from year to year, from January 1, 1920, to the time of the failure of the bank, and is supported by the original records in Henochsberg's handwriting, and is so convincing as to leave no doubt of Henochsberg's shortage, at least to the amount shown. This exhibit shows a shortage of $8408.54 existed on January 1, 1920, together with the accounts from which the sums making up the shortage and the dates thereof are shown.

"8. Clarence Henochsberg had in force at the time of his death $110,000 of life insurance. Because of a suicide provision only $2,000 was paid on a $10,000 policy issued by the Columbia Mutual Life Insurance Company, and only the initial premiums refunded on $10,000 issued by the Traveler's Insurance Company, and $20,000 issued by the Equitable Life Assurance Society. Of this insurance which he carried $33,000 was obtained prior to January 1, 1919, and the balance was obtained after January 1, 1920. The defendant, Jeanette B. Henochsberg, was named as beneficiary in all of these policies except six of $1000 each, which were payable to his daughter, Dorothy, and one of $5000 which was payable to his son, Joseph. All of these policies except the National Life Insurance Company policy for $5000 were in the possession of the widow, Mrs. Jeanette B. Henochsberg, in her safety-deposit box, at the American Savings Bank, at the time of his death. So far as appears from this record all premiums paid by Henochsberg on these policies prior to 1920 was paid out of his own funds.

"9. Henochsberg had six accounts in the American Savings Bank in which he made deposits and against which he drew checks. These accounts were C. Henochsberg, Commercial; C. Henochsberg, Savings No. 2500; Mrs. C. Henochsberg, Savings No. 1812; Mrs. Clarence Henochsberg, Trustee for Dorothy, Savings No. 3748; Mrs. Jeanette Henochsberg, Trustee for Joseph, Savings No. 11950; and Mrs. N. Henochsberg, Savings No. 1770.

"Complete audits and analysis of these several accounts since January 1, 1920, were made and are filed as Exhibits 'A' and 'F,' to the deposition of E. A. Jackson. These audits are made from the original ledger sheets and are supported by the original deposit tickets and cancelled checks, where they were obtainable. In many instances the source of the deposit is shown on the deposit slip, while in others there is nothing to indicate the source; the character of the deposits in this report is shown on the audits as 'Deposits, Miscellaneous and Plain,' respectively; the 'Plain' deposits being those in which there is nothing to indicate the source of the deposit. From those audits it is shown that Henochsberg paid all his life insurance premiums since 1920 by checks drawn on these accounts, as follows:

| | |
|---|---:|
| "C. Henochsberg, Commercial Account | $8,825.39 |
| "C. Henochsberg, Savings Acct. —2500 | 402.40 |
| "Mrs. C. Henochsberg, Savings Acct. 1812 | 759.45 |
| "Mrs. N. Henochsberg, Savings Acct. 1770 | 780.78 |

"Making a total of ............................$10,768.02

"Henochsberg's salary was $350 per month, and was regularly credited to his commercial account in installments of $175 on the 15th and last day of each month.

"Clarence Henochsberg made all the deposits in these six accounts and drew all the checks against them since January 1, 1920, except 969 checks drawn by Mrs. C. Henochsberg and six checks amounting in all to $310.91 drawn by Mrs. Nannie Henochsberg against a total of $12,649.98, drawn on her savings account No. 1770.. Mrs. Henochsberg was given a weekly allowance of $35 until 1925, and then $45 per week for the household expenses, in addition to this she was given the privilege of checking against the first five accounts above named and in the seven years from January 1, 1920, to the time of the bank's failure on December 7, 1926, she drew 969 checks, totaling $22,206.30 on account of living expenses. During the same period Clarence Henochsberg drew 1375 checks amounting to $27,070.48 against these five accounts for living expenses; 297 checks for cash, totaling $14,182.07; 37 checks amounting to $8246.48 on house and fixtures in Hein Park; 193 checks amounting to $18,742.05 on account of miscellaneous investments; 174 checks totaling $9987.24 for life insurance premiums; and 41 checks totaling $1691.90 for other insurance. From

this it will be seen that in this seven-year period since January 1, 1920, Henochsberg spent on account of living expenses alone, the following sums:

"Weekly allowance to wife for household $14,000.00
"Checks drawn by wife for living expenses 22,206.00
"Checks drawn by himself for living expenses 27,070.00

"Making a total of ........................... $63,276.00
"An average of over $9000 per year, and in addition to this an average of more than $2000 per year in checks drawn to cash. Add to this the other items above enumerated we have an aggregate expenditure of $116,105, or an average of $16,587 per year; in addition to this he drew checks aggregating more than $12,000 against his mother's account, a considerable part of which was certainly used by him for his own benefit.

"10. The proof shows clearly that a very considerable part of the deposits made to the six Henochsberg accounts above mentioned were made from funds stolen from the bank. During the seven-year period after January 1, 1920, plain deposits (i. e., deposits in which the source is not indicated) to the amount of $58,000 exclusive of his salary were made to these accounts; and apparently fictitious sources are given for many of the miscellaneous deposits made to these accounts, such as the Sawyer and Schmalzreid interest deposits made long after these loans were paid off.

"It is insisted that Henochsberg had other sources of income than from his salary; there are deposits of coupons and dividends from stock amounting to $2121.82 in the seven-year period; and he is shown to have made a profit of approximately $1000 in a partnership venture with one Clark in the purchase of washing-machine notes; his other outside enterprises were unprofitable. He had some interest with J. E. Wolfe, in the operation of the steamer 'Whisper' which sank in 1919, and on which he lost money. He was interested in a farming and cattle-raising venture with T. G. Uhlhorn, in which they lost money, and a partnership with E. F. Perry in raising and fattening pigs which was also a losing venture; he was also interested with H. D. Cash in a timber track on the river in Tipton county, known as 'Booker's Towhead,' from which they never realized the amount of their investment, and by his own confession he lost large sums in gambling at the Rex Club over a period of years. So from the proof it is undisputable that a very considerable part of the deposits made in the six Henochsberg accounts at the American Bank were made from funds stolen from the bank, and were thus commingled with his own funds legitimately deposited in said accounts.

"11. In 1926 and 1925 Henochsberg erected and furnished an expensive residence in Hein Park, an exclusive residence section in

Memphis. The title to the lot was in the joint names of Henochsberg and his wife. The building cost was financed by means of first and second mortgage loans obtained from Marx & Bensdorf amounting to $16,000. The difference between the total cost and the proceeds of the Marx & Bensdorf loan was paid by checks drawn on the American Bank. Checks for this purpose to the amount of $8716.20 are identified; and in addition thereto checks to the amount of $2741.31 have since been paid to Marx & Bensdorf on account of principal and interest on said first and second mortgage loans, making a total of $11,457.51 paid by checks on the American Bank on account of the completion of the house 'and in payments on the Marx & Bensdorf loans.

"Since the death of Henochsberg the place has been sold for $25,-000, and the amount of the equity . . . is being held pending the result of this litigation.

"12. As shown by said audit, Exhibit 'A' to the deposition of E. A. Jackson, Clarence Henochsberg drew checks against said five Henochsberg accounts to the amount of $18,742.05 on account of miscellaneous investments after January 1, 1920. Of this amount checks to the amount of $2220 were drawn out of Henochsberg's commercial account since January 1, 1923, in favor of the Arkansas Building & Loan Association, on the purchase of its shares on the monthly payment plan. Two of these certificates in the possession of the defendant were surrendered for cancellation after the death of said Clarence Henochsberg, and the proceeds thereof amounting to $1233.37 are being held by S. M. Brooks to abide the result of this litigation with reference to same.

"Included in said sum 'of $18,742.05 drawn on said Henochsberg accounts on accounts of miscellaneous investments, is the sum of $1,000 for the purchase of one share of stock in the Standard Oil Company of New Jersey; $665.88 for the purchase of six Shrine Second Mortgage Bonds; $1496.76 on the purchase of ten shares of American Telephone & Telegraph Company stock; and these stocks and bonds were among the papers of the said Henochsberg at the time of his death and are now in the hands of the liquidating agent of said bank. I find that all of said stock and bonds were paid for by checks drawn by Henochsberg on said bank, and that the deposits against which the same were made up of funds stolen from the bank and commingled with the legitimate deposits made in said accounts.

"13. In addition to the six accounts mentioned in the American Savings Bank, Clarence Henochsberg had an account in the Guaranty Bank & Trust Company, which was afterwards merged with the Union & Planters Bank & Trust Company, and the defendant, Mrs. Jeanette B. Henochsberg, had an account with the Franklyn Savings Bank & Trust Company, which was a branch of the Union & Planters

Bank. During the past six or seven years before his death, Clarence Henochsberg made frequent deposits of cash in large amounts in these two accounts, with nothing on the records to indicate the source of such deposit, many of the deposits are on the blanks of the American Savings Bank, in Henochsberg's handwriting, and the deposits were generally made by the negro porter of the American Bank. It is quite likely that many of these deposits were also made from the moneys stolen from the American Bank, as the proof shows no other so prolific a source from which Henochsberg could have derived so great an amount of cash. No effort is made to trace any of these deposits into any of the property sued for, however, except about $106 drawn in payment of insurance premiums. The said Jeanette B. Henochsberg had a balance of $4879.17 in said account in the Union & Planters Bank at the time of the death of her husband, of which amount $2879.17 has since been drawn out, leaving a balance of $2000 on deposit, and the complainant is now claiming this $2000 and a decree against her for the $2879.17 drawn out since his death.''

In addition to the above finding of the facts, the Chancellor upon request from complainants, found the following further facts: That the American Savings Bank & Trust Company had a paid-up capital of $100,000 on December 7, 1926, and that its books showed surplus and undivided profits of $123,000 on December 7, 1926; that at the time the bank was closed on December 7, 1926, it was hopelessly insolvent, and that its assets would not pay the depositors in full, and that there will remain a balance of about $300,000 owing to depositors. That exhibit ''B'' to the deposition of E. A. Jackson is a true and correct audit and reflection of the first five bank accounts hereinbefore referred to, and shows the alleged deposits of Clarence M. Henochsberg and his actual withdrawals from said bank through and by means of said accounts. That exhibits ''A,'' ''B,'' ''D'' and ''F'' to the deposition of E. A. Jackson, and exhibit ''C'' to the deposition of R. W. Hall, read in connection with the whole record, exclude every reasonable hypothesis other than that all payments made after January 1, 1920, on the insurance policies and other investments involved herein, were made by Henochsberg out of the funds of the American Savings Bank & Trust Company, embezzled and misappropriated by him.

That Clarence M. Henochsberg paid to his mother, Nannie Henochsberg, from and through his accounts, during the years 1920 to 1926, inclusive, money that he received from her on account of rents from her properties collected by him, or loans or interest or otherwise collected by him for her account during said period.

That the defendants, Jeanette B. Henochsberg, Dorothy Henochsberg, and Joseph Henochsberg, paid no money on, nor parted with any valuable consideration for or on account of any of the invest-

ments sought to be impressed with the constructive trust by the complainant under the original or amended bill, and are but volunteer holders of the same through and under the deceased, Clarence Henochsberg.

At the request of the defendants, the Chancellor found in substance the following additional facts: That Jeanette B. Henochsberg, wife of Clarence Henochsberg, at the time of her marriage in 1912, received $2500, which she deposited in the American Savings Bank & Trust Company, savings account No. 1812, and which Clarence Henochsberg loaned and invested for her; that the record does not show that she had any assets except as reflected in her bank account after 1920.

That Mrs. Nannie Henochsberg, mother of Clarence Henochsberg, had an estate of her own which was initially $20,000 insurance on the life of her husband. The money was invested in real estate, bonds and mortgages. Clarence Henochsberg had full power to draw checks and also to execute notes for his mother.

That the Clarence Henochsberg commercial account, as appears from the books of the bank, was overdrawn on the dates set out in the special request beginning on November 7, 1920, and on certain dates thereafter as set out in the Chancellor's finding on this special request to November 16, 1926.

That Clarence Henochsberg had sources other than his salary and the funds of the American Savings Bank & Trust Company, from which he obtained funds, but the amounts received from these sources are insignificant.

Upon the facts as found by the Chancellor as above set out, the Chancellor decreed that the State Superintendent of Banks, as the receiver for the bank, is entitled to have a constructive trust impressed upon, and to be decreed to be the equitable owner of all the proceeds realized from the policies of life insurance taken out by Clarence M. Henochsberg, upon his life subsequent to January 1, 1920, and that all premiums thereon were paid out of the funds of the American Savings Bank & Trust Company, embezzled, stolen and misappropriated by the said Clarence M. Henochsberg, deceased. The amount realized on these policies of insurance aggregated the total sum of $45,087.44; that the complainant is likewise entitled to have a constructive trust impressed upon, and to be decreed to be the equitable owner of a proportionate part of the proceeds realized from all policies of insurance on the life of Clarence M. Henochsberg, deceased, taken out by him prior to January 1, 1920; and that the proceeds from said insurance policies be pro rated between the complainant and the beneficiaries named in the policies in the ratio that the amount of premiums paid thereon subsequent to January 1, 1920, sustain to the premiums paid thereon prior to January 1, 1920; and

that under this apportionment that the total amount of proceeds from said policies, the receiver would receive the sum of $22,250.34, and the beneficiaries named in the policies the remainder. The Chancellor further decreed that the complainant is entitled to have the constructive trust impressed upon, and to be decreed to be the equitable owner, of the aforementioned shares of stock in the Standard Oil Company, the American Telephone & Telegraph Company; Chemical Products Company, and the Shrine Building Company second mortgage bonds, which were impounded in the cause; that the complainant is also entitled to have the constructive impressed upon and to be decreed to be the equitable owner of the proceeds of the certificates in the Arkansas Building & Loan Association, amounting to the sum of $1233.37. The Chancellor further decreed that the complainant is entitled to have the constructive trust impressed upon and to be decreed to be the equitable owner of the sum of $11,457.51 of the total net proceeds of the $12,961.05 realized from the sale of the Hein Park property and that the balance of the amount realized, amounting to $1,503.54, should be decreed to belong to Mrs. Jeanette B. Henochsberg, finding and holding and decreeing that subsequent to the death of Clarence M. Henochsberg the said sum of $1503.54 was paid on the mortgage indebtedness on the said house and lot by Mrs. Jeanette B. Henochsberg, and the Chancellor accordingly decreed as to the respective items and matters.

From this decree, the defendants, Jeanette B. Henochsberg, and the minor defendants, Dorothy and Joseph Henochsberg, by their guardian ad litem, have appealed to this court, and the appeal has been duly perfected and errors assigned.

The several assignments of error present numerous propositions of both law and fact. It would but unnecessarily lengthen this opinion to take up and discuss separately each of the assignments of error. The several propositions of law presented by appellants are as follows: First, that there is no precedent in Tennessee which warrants the imposition of a constructive trust upon the proceeds of life insurance policies, premiums on which are paid wholly or partly with misappropriated moneys. Second, that property rights in the insurance policies involved in this case vested in the beneficiaries named in the policies upon the payment of the initial premiums; that policies aggregating $33,000 in amount were obtained prior to 1920 and that the initial premiums on these policies were paid by Henochsberg out of money rightfully belonging to him, and that as to these policies, at least, the complainant would only be entitled to a lien for the amount of premiums, if any, paid by Henochsberg out of the misappropriated funds of the bank. It being further insisted in this connection by appellants that where property is purchased with the funds of the wrongdoer, and title vested in him or in another, and subsequently deferred payments are made by him upon this prop-

erty wrongfully from the funds of a cestui que trust, in that event the cestui que trust cannot claim the property nor any portion of it, but is confined to securing the lien on it to the extent or to the amount that went into the deferred payment or payments to pay off encumbrances. Third, that an imposition of a constructive trust never follows the mere showing of a misappropriation of funds; that the funds misappropriated must be traced into the specific property sought to be made the subject of the trust. Fourth, that after each overdraft in Henochsberg's accounts, the misappropriated moneys, if any, in the accounts became wholly depleted, and the trust fund cannot be treated as reappearing in moneys subsequently deposited in the account.

Fifth, that since tracing of the misappropriated moneys into the property sought to be charged with the trust is a vital condition of the substantive right of complainant, the burden is upon the complainant to clearly and definitely trace the moneys into the Henochsberg accounts and out of the Henochsberg accounts into the premiums paid on the insurance policies and the payments on the other investments herein involved.

Sixth, that the complainant is not entitled to recover upon mere surmise, probability, or conjecture, upon the supposition or inference that some of the bank's money paid any part of the premiums, and therefore where the evidence shows that Henochsberg had funds other than the bank's funds available for the payment of the life insurance premiums and the other investments, it is as fair to infer that he paid out of those funds as it is that he paid out of the bank's funds.

Seventh, that a presumption must be based on a fact and not on inference, or upon another presumption.

We deem it unnecessary that each of these several propositions be taken up and considered separately and in the order presented, and some of these propositions may be considered collectively and generally.

It is said by appellant that there is no precedent in Tennessee which warrants the imposition of a constructive trust upon the proceeds of life insurance, premiums on which are paid wholly or partly out of misappropriated funds. It is further said in this connection that life insurance on the life of a deceased husband is not such property as can be impressed with a constructive trust under the Tennessee statutes, and is contrary to the public policy of the State. Appellants rely upon Sections 4030 and 4231, Shannon's Code, and also upon the Tennessee cases of Dawson v. National Life Ins. Co., 156 Tenn., 306; Harvey v. Harrison, 89 Tenn., 470; White v. Bickford, 146 Tenn., 613.

The sections of the Code referred to exempt life insurance to the widow and next of kin from the debts of the deceased husband,

whether payable to the widow and children, as the named beneficiaries, or whether payable to the estate of the deceased insured. By Section 4030 it is provided:

"A life insurance effected by a husband on his own life shall enure to the benefit of the widow and next of kin, to be distributed as personal property, free from the claims of his creditors."

The primary purpose of this Act was to exempt the life insurance of the husband from the claims of creditors and to preserve the same for the widow and children, or next of kin, and to enable a husband or father to provide a fund, after his death, for his family. (Harvey v. Harrison, 5 Pick., 476; Ross v. Wortham, 11 Pick., 510; Cooper v. Wright, 2 Cates, 210.)

The statute creating the exemption of life insurance effected on the life of husband or father will be liberally construed so as to give effect to the remedy the legislature intended to afford. (See cases above.)

By Section 4231 it is provided:

"Any life insurance effected by a husband on his own life shall, in case of his death, enure to the benefit of his widow and children; and the money thence arising shall be divided between them according to the law of distributions, without being in any manner subject to the debts of the husband, whether by attachment, execution or otherwise."

We have been unable to find any case decided by the Supreme Court of this State that supports the contention of appellant on the question of the equitable right of a court of chancery to impress a constructive trust on life insurance effected by the insured on his life, and where the premiums are paid out of funds fraudulently misappropriated. In neither of the cases cited by appellant from the Supreme Court of this State is this contention of appellant sustained, or even discussed. In neither of these cases do we have the question of money illegally and unlawfully and fraudulently taken from another with which the life insurance premiums are paid, and on account of which the cestui que trust seeks to impress a constructive trust on the life insurance. In Dawson v. National Life Ins. Co., supra, the question there was the right of a trustee in bankruptcy to recover the surrender value or cash value of a life insurance policy on the life of the bankrupt. The contention of the defendant in that case was that life insurance on the life of the husband or father was exempt in favor of the widow and next of kin under the Tennessee statutes. The contention of the trustee in bankruptcy was that the cash value or the surrender value of the policy at the time it was attached was an asset of the bankrupt, and that the exemption to the widow and next of kin did not extend to the cash or surrender value during the lifetime of the insured. The Supreme Court held that it

was exempt under the statute on the subject. It will thus be seen that no question of a constructive trust was involved in that case.

In White v. Bickford, supra, the question there involved was the right of a nonresident minor child to the proceeds of insurance on life of a resident of this State where the insurance was payable to the estate of the deceased insured. It was held that the minor child, although a nonresident of the State, was entitled to collect the insurance, although she was a resident of the State of Georgia where the statute of exemption was limited to citizens of that State.

In Harvey v. Harrison, supra, it was held that the exemption was valid against creditors existing at the inception of the insurance, although the assured was then and continued to be insolvent, devoting his entire estate in payment of premiums. It was held in that case that the exemption was unconditional, and its expressed object was to withdraw a fund from creditors for the benefit of the debtor's family. There was no contention in that case that the relation of trustee and cestui que trust existed between the insured and the creditor. In that case the insurance premiums were paid by the insured out of his own money or property, and in so doing he became insolvent. But there was no question of fraudulent misappropriation of funds used by the insured in the payment of the premiums on the policies involved.

In Jackson v. Benefit Ass'n, 140 Tenn., 495, the question there involved was with reference to the liability of the insurance company where the insured came to his death by suicide, there being no provision in the policy making suicide a ground for relieving the benefit association from liability. In that case it was insisted that even though there was no provision in the contract rendering the policy void if death resulted from suicide, that it was contrary to public policy, and that the beneficiary of the insured should not be entitled to recover where the insured has committed suicide even though there was no suicide clause in the policy contract. The court held in that case that at the time the insurance was taken the insured did not contemplate suicide, and hence there was no fraud, and further held that it was not against public policy to allow a recovery.

It will thus be seen that neither of the cases cited and relied upon by appellant sustains the contention now being made. It is urged upon us by appellants, however, that the direct question has not been before the appellate courts of this State, and is in fact, a new question not controlled by any decisions, at least the exact contention presented to the effect that the life insurance premiums paid are not all that is put into the policy, but that the life of the insured is an element to be considered before insurance becomes an asset of the estate of the insured.

We have been unable to find any authority that supports this contention, or any decision wherein the courts have considered that life insurance purchased with funds fraudulently misappropriated by the insured constitutes a character of property not subject to the imposition of a constructive trust in behalf of the cestui que trust. On the other hand the question of the right of the cestui que trust to follow stolen funds into life insurance has been before the courts of other states, and no such property distinction is made in any of the cases to which our attention has been called.

One of the early cases on this subject is that of Shaler v. Trowbridge, 28 N. J. Eq., 595. From the facts as stated in the opinion, it appeared that Trowbridge was a member of a co-partnership which terminated by the death of Trowbridge. During its continuance Trowbridge had full charge of the books and the finances of the firm; that he alone was entrusted to draw checks on the firm's bank account, and exclusively managed its money affairs. He made up the annual balance sheets which were presented by him to the other members of the firm. The balance sheets so made up by him were false, and the books of the firm contained false entries. He used large sums of the co-partnership's money for his own use, by drawing checks on the bank account of the firm in payment for purchases made for his individual use, and did not charge these checks against himself on the books of the firm, nor did he include the same in his annual balance sheets and statements rendered by him to the members of the firm. Out of the moneys drawn upon the uncharged checks, or by the checks themselves in some instances, Trowbridge paid for certain real estate taking the title to himself, and paid the premiums on the insurance policies involved in that suit. The fraud was not discovered until after his death. It was held by the court in that case that a partner intrusted with the management and operation of the firm's business, who fraudulently misappropriated the money of his firm and invested a part of the misappropriated money in the payment of life insurance premiums on his own life, he will, in equity, be charged by construction as a trustee for the partnership. The court, in disposing of the questions involved, said: "This is not a case of a resulting trust, where the trust results, or is implied, from the contracts and relations of the parties. It arises ex maleficio out of the act of fraud and dishonest conduct of the partner, and may be termed a constructive trust, which equity will fasten upon the conscience of the offending party, and convert him into a trustee of the legal title. It differs from other trusts in that it is not within the intention or contemplation of the parties at the time the contract is made upon which it is construed by the court, but it is thrust upon the party contrary to his intention and against his will. This rule applies to a partner who fraudulently purchases for himself and with the part-

nership's funds, and it extends to personal as well as real estate; in every case the equitable ownership rests in the person from whom the consideration moves." Numerous authorities are cited in the opinion, including Johnson v. Dougherty, 3 C. E. Gr., 406; Cutler v. Tuttle, 4 C. E. Gr., 558; Dyer v. Dyer, 1 Lead. Cas. in Eq., 203, and Perry on Trusts.

In the case of Holmes v. Gilman, by the Court of Appeals of New York, decided in June, 1893, we have another well-considered case, wherein it was held that the surviving partner could recover the proceeds of life insurance, the premiums of which had been paid out of misappropriated partnership money by the deceased member of the firm. In that case it was specifically held that the wife's insurable interest in the life of decedent was not property in the sense that it was mingled with the money converted so that only the amount of premiums could be recovered. In that case it was said:

"In this case, however, there is the fact which alters and colors the whole transaction, and is fundamental and controlling in its nature, and that fact is that the moneys which procured the insurance were trust moneys, and although invested in the policies, they were subject at the very moment of such investment to the right of the owner of the funds to follow them into whatever change of form they might assume, and to claim the thing into which they were changed as if it were the original fund."

The case of Truelsch v. Northwestern Mutual Life Ins. Co., reported in 202 N. W., page 353 (advance sheets), from the Supreme Court of Wisconsin, discusses several of the questions made on the appeal we now have under consideration. In that case Truelsch was employed as a clerk and bookkeeper for a period of several years. He had stolen during the several years of his employment with the firm about $4400. When his books were about to be audited he took $40 from the cash drawer and used it in paying a premium on a life insurance policy payable to his wife. He then addressed a letter to his wife, and also a note to a son of the member of the firm by which he had been employed, admitting the theft of $4400 from the firm, and then committed suicide. As the bookkeeper of the firm he also handled the bank account. By various methods he succeeded in concealing from the firm the various peculations by making certain false entries on the books and forced balances. In that case it was contended by the widow that there had been a failure to trace the stolen funds into the life insurance premiums, except the payment made by the $40 stolen on the day he committed suicide. The facts in that case, as found by the referee, disclosed that from January, 1914. to March 30, 1917, Truelsch was paid a salary for his services of $3195, and during that period unlawfully took and embezzled from his employer the sum of $4477.73; that after January 1, 1914, all of

the premiums on the policies were maintained and paid by the moneys so misappropriated; that the embezzlement was concealed by false entries and fraudulent manipulation of an adding machine. There is contained in the opinion a schedule showing the shortages of the deceased and the history of the payments made on the insurance policies involved. The trial court held that Truelsch had the confidence of his employer, but he was a mere employee, and not a trustee within the strict definition of equity. On appeal it was said by the appellate court: "We do not regard it as very important in this case whether his relation to his employer be described as trustee or employe, by reason, of such duties as were entrusted to him, he stole or embezzled the funds of his employer, and an equitable remedy were necessary to right the wrong, and reach the funds or property into which they might pass, there existed a constructive trust, which a court of equity might enforce against the wrongdoer, if he were living. The rule applies in cases where property is stolen or embezzled, although it is most often invoked to prevent the success of fraud in the myriad forms which it assumes. When necessary, the courts thrust the trust on the wrongdoer, without regard to whether there was an intention by the parties to create a trust, and in the absence of a technical or conventional trust relation.

"It would be a signal failure of justice if one who has become a constructive trustee by reason of wrongfully receiving or securing the property of another could escape the consequences of his acts by changing the form of the property thus acquired. Hence, as between him and the cestui que trust the latter may pursue the funds into the new investment and charge that investment with the trust. He may also assert and enforce the same right against third parties to whom the property has been transferred with knowledge of the trust, or who have paid no consideration for it, provided the identity of the trust fund can be established. In this case, if the premiums paid from funds stolen or embezzled from the appellant, each policy becomes impressed with a trust in the appellant's favor the instant each premium was paid."

In that case, speaking on the subject of life insurance on the life of a husband enuring to the benefit of the widow free from the debts of the insured, as provided by statute in the State of Wisconsin, the court said:

"The statutes guarding the rights of married women in insurance policies and homesteads are beneficent statutes, which are liberally construed in their behalf. But they are not designed to encourage fraud or to make such property a safe depository for stolen funds."

We think that the above-quoted language from the Wisconsin court is a clear statement and interpretation of state statutes exempting

a life insurance on the life of a deceased husband from claims of creditors. The Supreme Court of this State has held in numerous cases that our statutes on the subject of exempting life insurance to the benefit of the widow and children of a deceased husband and free from the debts of the deceased husband should be liberally construed in favor of the exemption. (Harvey v. Harrison, supra; Dawson v. Nat'l Life Ins. Co., supra; White v. Bickford, supra.)

But in each and every instance the cases presented facts showing that the insurance premiums were paid out of funds belonging to the insured. Neither in this State, or by the appellate courts of any state, has it been held that life insurance purchased by the insured with stolen or misappropriated funds would enure to the benefit of the widow and children under the statutes of exemption referred to, against the equitable rights of a cestui que trust of a trustee ex maleficio.

Appellant has cited the case of Thum v. Wolstenholme, decided by the Supreme Court of Utah April 30, 1900, and reported in the advance sheets to the Pac. Rep, in support of the contention made under the second proposition of law made by appellant in the brief, to the effect that the policies aggregating $33,000 in amount taken out by the deceased Henochsberg prior to 1920, and the premiums prior to January 1, 1920, having been paid out of the money of Henochsberg, could not be impressed with the constructive trust in favor of the receiver, but, at most could only have a lien declared on the proceeds of those policies for the amount of the premiums paid out of the misappropriated funds of the bank, with interest thereon. The Utah case seems to support this contention by the majority opinion of the Utah court. However, there is a · dissenting opinion by the Chief Justice of the Utah court which does not sustain this contention. The majority opinion in the Utah case is. contrary to the decided weight of authority and we think the dissenting opinion by the Chief Justice of the Utah court is in line with the weight of authority. It is said in the majority opinion in that case under headnote five:

"After an assured has obtained title to a policy of insurance, if he uses funds of a bank, of which he is manager, in paying subsequent premiums, and such funds can be traced into the policy, a court of equity will give a lien for such sums and interest on the proceeds of the policy."

In the case of Mass. Bonding & Ins. Co. v. Josselyn, decided by the Supreme Court of Michigan. in July, 1923, and reported in 194 N. W., 548, practically all of the questions involved in this suit were involved in that case. including the question of apportioning the insurance where the initial payments for premiums were made out of the funds of the insured and subsequent premiums were paid by the insured out of misappropriated funds. In that case it was held:

"Where an administrator misapplied moneys of the estate to the premiums on policies of life insurance which had been procured by him prior to his appointment as administrator, the proceeds of said policies were impressed with a trust in favor of the estate in the proportion that the payments from the money so misapplied bore to the total premiums·paid." (Fifth Headnote.)

In discussing the rule of apportionment in the above case, the case of Holmes v. Gilman, 138 N. Y., 369, 20 L. R. A., 566, 34 Am. St. Rep., 463, is referred to. We have examined Holmes v. Gilman, supra, and while this question is not directly made the point of decision in that case, but the court, while stating that it was not necessary there to decide the point, did use this language in discussing the question:

". . . but I am not at all prepared to admit that under no circumstances is the cestui que trust entitled to recover back anything more than the amount of his property and interest, where there has been a mingling of funds. In case the trustee took a thousand dollars of trust funds and five hundred of his own, and purchased property which advanced in value to twice its original sum, I have seen no case where the point has been determined that the whole increased value belongs to the trustee, and that only the original sum wrongfully taken and interest can be given to the cestui que trust, although it was by reason of the wrongful use of the trust funds that the trustee was enabled to realize such value. If in such case the cestui que trust were not allowed to at least participate proportionately in this increased value it would appear to be a violation of the principle that the trustee cannot ever be permitted to make a profit out of the use of trust funds. It seems to me to be a case for the application of the doctrine that the parties became co-owners of the property at the option of the cestui que trust, in the proportion which their various contributions bore to the sum total invested."

In the case of Vorlander v. Keyes by the Circuit Court of Appeals, Eighth Circuit (Fed.), decided September 8, 1924, there is contained a full discussion of many of the questions involved on this appeal, including the question of apportioning the proceeds of a life insurance policy where the insured paid premiums in part from his own funds and in part from misappropriated bank funds, and on this question the court said:

"(5) Without a disregard of these fundamental rules of equity jurisprudence, there is no logical or rational way of escape from the conclusion of the court below, that when the insured paid with the funds of the bank one-half of the initial premiums of these policies, he became a trustee ex maleficio for the exclusive benefit of the bank of one-half of the title and interest in the

insurance policy. If he had paid three-fourths of those initial premiums with the funds of the bank, he would have held three-fourths of the title and interest in the policies in trust for the bank. In this case, before the insured died, he paid with the funds of the bank the premiums on the policies for the second year, so that from the time of the payment of those premiums, and at the death of the insured, one-fourth of the amount invested in the policies had been paid by the insured with his own property, and three-fourths thereof with the misappropriated funds of the bank, and the court divided the fruits of those investments, the proceeds of the policies, between the widow and the receiver of the bank in that proportion. That division is just, equitable, and right, and the decree below is affirmed.''

We are of the opinion, that by the great weight of authority, any property, purchased by one sustaining a fiduciary relation, with the funds of his employer illegally misappropriated, is purchased by a trustee ex maleficio, and any property so purchased by him and taken either to himself, or to a simple volunteer, is impressed with a constructive trust in favor of the cestui que trust, and that the cestui que trust is therefore entitled to receive all the profits accruing from the transaction. We are also of the opinion that where the property is purchased partly with the funds of the trustee and party with the fraudulently misappropriated funds of the cestui que trust, that a constructive trust will be impressed on the property in the ratio that its purchase is made by the use of funds belonging to the trustee and the funds belonging to the cestui que trust. We are also of the opinion that life insurance on the life of the deceased trustee ex maleficio is to be treated as any other personal property, and that a constructive trust will be impressed on the proceeds of such insurance, where it appears that the insurance was purchased in whole or in part with the misappropriated funds of the cestui que trust, and that the rule of apportionment will be applied where the insurance is purchased and the premium paid partly out of the funds of the insured and partly out of the misappropriated funds of the cestui que trust.

However, no constructive trust can be impressed upon property unless the misappropriated fund is traced into the property sought to be impressed with the trust.

It is urgently insisted in this case by appellants that the complainant has failed to show by satisfactory or sufficient evidence that any part of the funds stolen by Henochsberg from the bank went into any of the property, the life insurance involved, the Hein Park property, and the other property involved in this case, and that without a sufficient tracing of the misappropriated or stolen funds into this property that there can be no constructive trust in favor of the bank.

There can be no question, but that the stolen funds must be traced into the property sought to be impressed with the constructive trust. This principle has been recognized by the courts and textwriters with practical unanimity. In Moffat v. McDonald, 30 Tenn., 457, which appears to be among the earliest of Tennessee cases on the subject, it is said:

"It must, however, be clearly established, that the property upon which the trust is sought to be fastened has been paid for out of the specific trust fund. It is not sufficient to prove that the purchaser of the·property had a fund belonging to another in his hand, unless the employment of that particular fund in the purchase be also proved."

In the late case of McDowell v. McDowell, 144 Tenn., at page 458, after reviewing the Tennessee cases on the subject, and other authorities, it is said:

"In order to follow trust money there must be specific property, capable of being identified, into which the trust money has gone."

Appellee concedes that the rule is as above stated, but insists that complainant has shown by proof that the property sought to be impressed with a constructive trust in this case, including the insurance premiums, was purchased with funds stolen from the bank, and that the stolen funds have been definitely traced into the payment of the insurance premiums and the purchase of the·other property, except insurance premiums paid on the policies issued prior to January 1, 1920.

It therefore becomes a question of fact as to whether the misappropriated and stolen funds of the bank by Clarence M. Henochsberg have been traced into the property sought to be impressed with a constructive trust in favor of the bank. It appears from the record that from January 1, 1920, to December 7, 1926, the date of the closing of the bank, Clarence M. Henochsberg, as the acting assistant cashier of the bank, and while in the actual control of the bank's accounting department, and having supervision of the individual ledger accounts and the cash, and other details of the bookkeeping of the bank, fraudulently misappropriated about $329,000 of the bank's money. The system employed by him in these peculations has been set out in the finding of the facts as found by the Chancellor. and in which finding we concur. Not all of this money so stolen by Henochsberg was passed through his various bank accounts, but it is evident that several thousand dollars of this stolen money was used by Henochsberg and did actually pass through his bank accounts in the American Savings Bank & Trust Company. His salary during this period, a part of the time, was $300 per month, and a part of the time $350 per month, and while he had some other business con-

nections during this period, it is clearly apparent from the record that his earnings from such sources were comparatively insignificant. His bank accounts showed deposits several times larger than any source of income that he had during this period. The checks drawn by Henochsberg and his wife on his accounts at the bank exceeded greatly any legitimate deposits made by him to these accounts. It is true that at no time during this period did his bank accounts reflect any considerable balance to his credit, and it is also true that on certain dates approximating the dates on which checks were given for insurance premiums, that his bank accounts would show small overdrafts. It would appear, and we think with sufficient definiteness, that Henochsberg employed a system of feeding into his bank accounts stolen moneys from the bank, from time to time, a sufficient amount to have his accounts show only small balances on any given date to his credit, and that this was one of the methods employed by him to deceive the bank officials, or to prevent suspicion. But it is clearly apparent from the record that checks issued by him in payment of the life insurance premiums after January 1, 1920, and in payment of the other investments, and payments on the other property sought to be impressed with a trust herein, were paid out of moneys which did not belong to him, and that he had so mingled the stolen moneys with his own funds in the bank accounts as to make it impossible to actually ear-mark the stolen moneys as having been used exclusively in paying the life insurance premiums and the payments on the other property involved. It is contended for appellants that this would necessitate the application of the rule of set-off, and that the misappropriated funds should have been set-off against legitimate deposits. We think a sufficient answer to this contention is that, the bank officials had no knowledge, intimation or suspicion that Henochsberg was a defaulter with the bank until the morning of his suicide. Henochsberg had so manipulated these accounts, as well as his own, as to successfully conceal his shortages and thefts. In this situation there was no opportunity for the bank officials to resort to set-off.

While recognizing the settled rule that the misappropriated funds must be traced into the specific property before there can be a constructive trust impressed, we are of the opinion that where the trustee ex maleficio has pursued a systematic scheme and plan of stealing funds from the bank, where he sustains the fiduciary relation of assistant cashier and has direct supervision of the accounting department of the bank and abuses the confidence of the employers of the bank, and by the method employed uses the stolen funds taken by him from the deposits of customers, and at such times as it becomes necessary and expedient feeds a sufficient amount of the stolen funds into his own bank account to protect checks drawn by him on his accounts in the payment of life insurance premiums and payments on the other

property sought to be impressed with the trust, that it constitutes such a tracing of the stolen funds into this property as to meet the exactions of the law with reference to impressing such property with a constructive trust. It would be a subversion of justice and all rules of equity to say, that a trusted employee charged with the duty of handling the funds of his employer, through a fraudulent scheme and systematic course of fraud and deception to steal the funds of his employer, and to mix such stolen funds with his own funds and out of the mingled funds, mingled with deliberate fraudulent intent to conceal and to hide away the identical funds stolen, and to invest such funds in property taken in his own name, could reap the fruits of his own misdoing at the expense of the employer.

In the early English case of Robinson v. Pett, Leading Cases in Equity, by White & Tudor, Vol. 2, It., 1, on pages 528-29, we have a very full discussion of the powers of a court of equity, in dealing with the wrongdoing of a trustee sustaining a fiduciary relation to a cestui que trust, wherein the writer of the opinion discusses the question of the co-mingling of trust funds by a trustee with his own funds so as to lose the identity of the misappropriated trust funds, or the profits arising from the use thereof. This language is used:

"The last person who can be heard to argue from the difficulty of tracing or apportioning the profits of the misapplied funds, is the man whose breach of' trust has caused the misapplication, and created the difficulty.

"When did a court of justice, whether administered according to the rules of equity or of law, ever listen to a wrongdoer's argument to stay the arm of justice, grounded on the steps he himself has successfully taken to prevent his iniquity from being traced? Rather let me ask, when did any wrongdoer ever yet possess the hardihood to plead, in aid of escape from justice, the extreme difficulties he had contrived to throw in the way of pursuit and detection, saying, 'You had better not make the attempt, for you will find I have made the search very troublesome?'. The answer is 'The court will try.' ''

Preceding the language above quoted, the learned Chancellor, Lord Chancellor Talbot, quotes with approval from the case of Docker v. Somes, 2 My. & K., 655, and which is referred to as the leading case to that date by the English Court, which case acknowledges the rule that a trustee will not be permitted to receive the profits derived from an investment of trust funds, but announces the further rule that the trust funds must be traced into the property before it will be impressed with a trust, but wherein the subject of commingled funds was involved, the following language used:

"But the principal objection which I have to the rule, is founded upon its tendency to cripple the just power of this

court in by far the most wholesome and indeed necessary exercise of its functions, and the encouragement thus held to fraud and breach of trust. What avails it toward preventing such malversations, that the contrivers of sordid injustice feel the power of the court only where they are clumsy enough to keep the gains of their dishonesty severed from the rest of their stores? It is in vain they are told of the court's arm being long enough to reach them, and strong enough to hold them, if they know that a certain delicacy of touch is required, without which the hand might as well be paralyzed or shrunk up.''

In the case of Truelsch v. N. W. Life Ins. Co., supra, the facts with reference to the tracing of the stolen funds were very similar to the facts of this case. In that case there appeared the statement taken from the auditor's report and evidence showing the amounts and dates of the shortages and the manner in which these shortages were arrived at by the auditor. In that case it did not definitely appear out of what particular embezzled funds the respective premiums had been paid. The account was so kept by the trustee ex maleficio as to conceal the exact use of the money embezzled. In holding that the life insurance in that case was impressed with a constructive trust in favor of the cestui que trust, the court said:

''It is a reasonable conclusion from all the evidence that the amounts described as shortage were not taken by Paul (Truelsch) in large amounts, but he abstracted small sums before the money went into the bank, and that at such times as he thought most safe falsified the books to cover the amounts. He kept a small bank account in which the balances shown were very small, often only a few cents, and never exceeded $19. If there was a systematic scheme to defraud his employer, such a course was safer than to keep a large bank account, which if discovered, might lead to suspicion. The books, exhibits, and statements used at the trial would probably not alone afford sufficient proof that moneys embezzled were used to pay the premiums. They do show that there was a systematic course of misappropriation of money of the employer, which was continued throughout the period included in the report of the referee, and they show such proximity between the times of embezzlement and the payment of the premiums as afford circumstantial evidence tending to prove the facts claimed by the appellant. But the referee did not rely alone on the documentary evidence of the kind now under discussion. The letters and the other documentary evidence, show beyond any reasonable doubt the defalcations found by the referee. In determining whether those funds were used in procuring or maintaining the policies, it was proper to consider the other sources of Paul's income, if any he had. These were care-

fully investigated by the referee, and he concluded that there were only two sources of income, to-wit, the salary and the embezzled funds.''

We have been cited to a discussion of commingled funds in an article appearing in 27 Harvard Law Review, p. 511, and from which the following quotation is taken:

"If money to which one person is legally or equitably entitled is wrongfully mingled by another with money of his own, so that the whole forms one indistinguishable mass, it was at one time held that all right to follow it is lost because it can no longer be identified; for, as it was said, 'money has no ear-mark.' This is, of course, a good reason why the person wronged cannot insist that any particular coins are his; but it is no reason why he should be denied an interest in the product, no reason why he should be relegated to a merely personal claim against the wrongdoer. This early doctrine is accordingly no longer law.''

The rule as above announced seems to be supported by abundant authority. (26 R. C. L., 1353, par. 217; 2 Perry on Trusts (7 Ed.), Sec. 828, p. 1404; Central National Bank v. Life Ins. Co., 104 U. S., 54, 26 L. Ed., 693.)

On the question of the duty not to mingle trust funds, the rule is stated in 3 Pomeroy's Eq. Juris., Sec. 1076:

"This second important duty of good faith includes not only the intentional use of trust funds in the trustee's own business; it prohibits the mixing the two funds together in one account, the depositing trust moneys in his own personal account with his own moneys in bank, borrowing trust funds or going through the form of borrowing for his own use, mingling receipts and payments of trust moneys and his own moneys in his books of accounts, and all similar modes of combining or failing to distinguish between the two funds.''

The record in this case is very large, consisting of several volumes of evidence and a great number of exhibits, and especially the exhibits to the auditors' depositions, showing in painstaking detail the accounts from which Henochsberg wrongfully abstracted money, and the tracing of such wrongfully abstracted funds. The case was argued at great length by very able counsel representing the respective parties at the bar of this court, and we have been furnished with elaborate briefs by the respective parties. We have devoted much time to the examination of the record and the comprehensive briefs filed, and the authorities therein cited and relied upon by the respective parties. From all of which we have reached the conclusion that all assignments of error must be overruled, and the decree of the Chancellor affirmed. We have not taken up for separate discussion each of the

several assignments of error, but in this opinion we have discussed and disposed of the questions presented on this appeal.

We find no error in the decree of the Chancellor and it is accordingly affirmed. Appellants and sureties on the appeal bond will pay the cost of this appeal. The cause is remanded to the Chancery Court of Shelby County for the carrying out of the decree.

Owen and Heiskell, JJ., concur.