*Decision will be entered under Rule 50.*

TENNESSEE FOUNDRY AND MACHINERY CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6209–65.   Filed June 26, 1967.

*Robert G. McCullough* and *William Waller,* for the petitioner.
*Jack D. Yarbrough,* for the respondent.

#### OPINION

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year ended March 31, 1964, in the amount of $12,787.37.

The only issue for decision is whether the proceeds of a life insurance policy received by petitioner in its taxable year ended March 31, 1964, are excludable as amounts received "under a life insurance contract * * * by reason of death of the insured," within the meaning of section 101(a)(1), I.R.C. 1954.[1]

---

[1] All references are to the Internal Revenue Code of 1954.

All of the facts of this case have been stipulated and are found accordingly.

Petitioner is a corporation organized under the laws of the State of Tennessee. Its principal office is, and was on the date the petition in this case was filed, located in Nashville, Tenn. It filed its corporation income tax return for its fiscal year ended March 31, 1964, with the district director of internal revenue at Nashville, Tenn.

On May 6 or 7, 1962, one of petitioner's employees (hereinafter referred to as the employee) who served as secretary and performed all the general bookkeeping and office management duties for the corporation, left a note on his typewriter in which he confessed to the embezzling of company funds. On May 7, 1962, he committed suicide.

The employee had been in petitioner's employ since 1944 or 1945. The period of embezzlement extended from 1956 or 1957 to the date of the employee's death. The total wages paid to the employee by petitioner for the years 1958 through May 6, 1962, as reflected on withholding tax statements (Form W-2) filed by petitioner, were:

| | |
|---|---|
| 1958 | $6,306.23 |
| 1959 | 5,755.76 |
| 1960 | 6,280.17 |
| 1961 | 6,505.17 |
| 1962 (to May 7) | 1,950.00 |
| | 26,797.33 |

The employee maintained a joint checking account with his wife at the Third National Bank in Nashville in which deposits totaling $44,645.45 were made during the period January 21, 1959, through May 14, 1962. Deposits of $200, $300 or $400, and other $100 multiples were frequent. The monthly bank statements show deposits in most of the months during this period ranging from approximately $700 to $2,000. During this period the employee deposited in the joint account only seven of the salary checks he received from petitioner, which seven checks totaled $1,232.31. Other salary or bonus checks issued by petitioner to the employee during this time were not deposited directly in the joint account.

The employee's wife was unacquainted with the details of her husband's income but knew of no source of income of any significance which he had other than from his employment by petitioner. She was unable to explain bank deposits or expenditures substantially in excess of the employee's salary. She was aware of a joint savings account which she and the employee maintained at the Third National Bank of Nashville in which approximately $3,000 was accumulated between 1954 and 1962, and of a separate savings account opened in her name only about 1960 at another bank in which approximately $5,000 had been accumulated by May 1962. The employee gave her the cash which

she deposited in the separate savings account. She was a housewife and had no source of income aside from funds received from her husband.

The employee and his wife had three children. The oldest child, a daughter of the wife by a previous marriage, was married and did not live at home. The family moved into a newly purchased home on which joint title was taken in 1957, for which they paid $25,000. Of this amount, $8,000 was derived from the sale of their previous residence and $17,000 was obtained by a mortgage with monthly payments of $155.50. In 1959 improvements costing $1,000 were made on the house and paid for by check. In 1962, a two-car garage was added to the premises and financed by a second mortgage with monthly payments of $54. These mortgages were currently paid at the date of the employee's death. He had made the payments, some of which were made by checks drawn on the joint account.

The family had two cars for several years. The employee owned a new 1962 Chevrolet station wagon at the time of his death and his wife owned a 1959 Cadillac which had been purchased new in late 1958. Originally, title to the Cadillac had been in the employee's name but title had been transferred to his wife shortly before his death. There was a balance due on the Chevrolet at the date of the employee's death which was paid off by credit life insurance. The Cadillac had originally been financed but was fully paid for when it was sold by the employee's wife in June 1962 for approximately $2,400. At some time the employee owned a couple of small boats, but he did not own them when he died.

The employee at the date of his death had life insurance policy No. 8 408 007 C which had been issued to him on August 7, 1959, by Metropolitan Life Insurance Co. This policy was for a basic amount of insurance of $10,000 plus a family income provision for term insurance for a 20-year term under which a monthly income of $10 for each $1,000 of the basic amount of insurance would be paid if the insured died within the 20-year period until the expiration of the 20-year term. The policy provided for alternative methods of settlement. In addition to policy No. 8 408 007 C the employee at the date of his death had the following insurance policies which were paid by the issuing companies:

| Company | Date of issue | Face amount | Beneficiary | Remarks |
|---|---|---|---|---|
| Aetna Life Insurance Co | | $2,500 | Wife | Group policy. |
| Metropolitan Life Insurance Co | 1959 | 10,000 | Wife | Group policy. |
| Metropolitan Life Insurance Co | 1940 | 2,000 | Mother. | |
| Liberty Mutual | 1942 | 750 | Mother. | |
| Connecticut Mutual | 1949 | 5,000 | Wife. | |
| Connecticut Mutual | 1951 | 2,500 | Wife. | |
| Connecticut Mutual | 1951 | 3,000 | Wife. | |
| National Life and Accident | | 500 | | Burial policy. |

The employee had two other insurance policies which were not paid except to the extent of premiums paid thereon because of the clauses contained therein with respect to suicide.

In the early morning hours of May 7, 1962, a custodial worker of petitioner had seen the employee burning some papers. Shortly after May 7, 1962, petitioner employed a national accounting firm to examine its books and records to determine the extent of the embezzlement. This report recited that the purpose of the examination was to determine the extent "of possible defalcations by an officer of the company, it being alleged to us that such defalcations may have occurred." It stated that the examination was directed toward discovering "to what extent, if any, defalcations or misappropriations had occurred and attempting to establish the amount of loss, if any, to the company." The report further stated:

Our special examination was made for a specific purpose by reason of the enumerated circumstances and as requested by the company and accordingly included a detailed examination and vouching of source documents, such as purchase invoices, cancelled bank checks and related records. Many of the findings as reported herein very likely would not and could not have been made in the absence of knowledge as to specific circumstances conveyed to us by company personnel * * *

We found, at the time of our special examination, that the general ledger cash account had not been posted for several months and that some accounting documents (such as bank checks and purchase invoices) could not be located and were therefore missing and that others were torn or mutilated. This was attributed in part to a small fire in the company's office early on the morning of May 7, 1962 (at which time the secretary was reportedly alone there), and in some measure to mutilation by rats. While we are not, of course, qualified in any way to examine and pass upon questioned documents, we must observe that some of the checks which we examined appeared to us to have been mutilated by means other than rats or fire.

The report detailed findings that H. C. Muck (the company's commission agent in Chicago) and Lewisburg Machine Works (one of the company's suppliers) had advised that they were not recipients of certain checks made payable to them, that certain checks to or allegedly for the benefit of the employee were found, that no checks were found supporting certain debits on the company's bank statements, and that information had been obtained from the company's vendors and suppliers to reasonably identify the greater portion of the amounts covered by the missing checks, and that certain purchase invoices recorded in the company's books as having been paid at March 31, 1961, had not in fact been paid at that date but that these amounts were thereafter paid by disbursement of company funds.

Following the detailed discussion, the report summarized as follows:

The summary is presented for clarification of matters referred to in the respective paragraphs and is not intended as conclusive indication of misappropriated

amounts, but is based upon the assumptions made and stated in the preceding paragraphs:

| | Years Mar. 31, 1957 to Mar. 31, 1961 | Period Apr. 1, 1961 to May 7, 1962 | Total |
|---|---|---|---|
| 1. Checks payable to H. C. Muck | $13,828.47 | $4,506.17 | $18,334.64 |
| Checks payable to Lewisburg Machine Works | 2,708.10 | | 2,708.10 |
| 2. Checks payable to [the employee] | 742.70 | 1,543.27 | 2,285.97 |
| Check payable to Metropolitan Life Insurance Co. (allegedly for account of [the employee]) | | 258.20 | 258.20 |
| 3. Unreconciled difference in bank account at March 31, 1962 (unidentified bank charges for year) | | 27,382.50 | 27,382.50 |
| 4. Accounts payable at Mar. 31, 1961 (which the company's records indicated had been paid) | 43,072.37 | | 43,072.37 |
| | 60,351.64 | 33,690.14 | 94,041.78 |

The item listed as "Check payable to Metropolitan Life Insurance Co." in the amount of $258.20 relates to check No. 02628 of petitioner dated September 7, 1961, which was made payable to the Metropolitan Life Insurance Co. (hereinafter referred to as Metropolitan), signed by the employee and containing another signature which was forged by the employee. This check was used to pay the semiannual premium on petitioner's Metropolitan insurance policy No. 8 408 007 C (hereinafter referred to as the policy) due in September 1961.

On June 21, 1962, petitioner's attorney wrote to Metropolitan concerning the policy in part as follows:

We are advised that [the employee] carried life insurance with your company, and we have found a check drawn on the Company's account and signed by [the employee], with forged countersignature, which check was payable to your company in the amount of $258.20 and was dated September 7, 1961. This check shows that it was deposited to your account on September 11, 1961 and we believe that this check may have been given to you in payment of a premium for insurance on [the employee's] life. There is also a possibility that [the employee] used other funds of the Company which he wrongfully obtained for the purchase of additional insurance with your company. Our client, Tennessee Foundry and Machine Co., Inc. [petitioner] would be entitled to the proceeds of all insurance on [the employee's] life which was paid for by money wrongfully obtained from our client. Therefore, we would appreciate it very much if you would give us the following information:

The information requested was the number of insurance policies the employee had with Metropolitan, the total amount of premiums paid on each such policy, the proceeds payable on each policy and whether such proceeds had been paid, the beneficiary designated in the policy, the policy or policies for which the September 7, 1961, check paid the premiums, and any other pertinent information.

A total of six premium payments were made on the policy. Four of the premium payments were by checks drawn on the joint account of the employee and his wife, one was made by the check of petitioner

of September 7, 1961, and the sixth payment was made in cash. Each premium paid was in the amount of $258.20.

In addition to the insurance on the employee's life, the policy provided term insurance of $2,700 on the employee's wife should she die before the endowment date, or an endowment of $1,000 if the wife were living on the endowment date, and term insurance of $2,000 on each of the employee's two minor children to age 25. Premiums were payable until the endowment date or prior death of the insured.

The policy provided that, unless Metropolitan were notified otherwise, the insured was owner of the policy and on his death his surviving insured wife or insured child would be the owner. Benefits were payable to the spouse of the insured or, if such spouse were not living, to the insured's estate. The policy provided for redesignation of either the owner or "payee" by written notice to the insurer.

Petitioner filed suit in the Chancery Court of Davidson County, Tennessee, on September 19, 1962, against the employee's widow, individually and as administratrix. The complaint alleged that the complainant (petitioner herein) had suffered a loss of "approximately $135,000" by forgery, embezzlement, and breach of trust and that the employee had converted the sums to his own use. The complaint alleged that:

said deceased purchased both real and personal property with said funds * * *. On May 9, 1957, said deceased purchased with said funds of complainant a house and lot at 417 Vantrease Road in Davidson County, Tennessee * * *. [S]aid deceased and defendant conveyed said property in trust * * *, to secure the payment of [loans] * * *. Said deceased made numerous payments on both of said notes with complainant's funds. Said deceased also purchased with complainant's funds furniture, appliances, and other household effects * * * and purchased a Cadillac automobile which he gave to defendant and deposited large amounts of complainant's funds in joint bank accounts * * *. Complainant alleges that it is entitled to an accounting from defendant * * * and that complainant is entitled to an interest in and lien upon said real estate, personal property, bank accounts and funds to the extent that complainant's said funds were used to purchase said real estate and personal property, or pay debts secured by lien thereon, or deposited in said bank accounts, and that complainant is entitled to recover the same from the defendant.

Petitioner prayed, among other things, for a decree in the amount of $135,000 and "that complainant be declared to be the owner of all other property for which [the employee] paid with complainant's funds or that complainant be awarded such liens on said property as it is entitled to."

The widow filed her answer on November 14, 1962, admitting ownership of specific items of property, denying the use of any of petitioner's funds in its purchase, denying petitioner's right to an accounting and pleading ignorance of, and inability to reconstruct, the decedent's financial affairs.

Petitioner filed its corporation income tax return for its fiscal year ended March 31, 1963, claiming an embezzlement loss of $30,349.72 computed as follows:

| | |
|---|---:|
| Discovered in year ended Mar. 31, 1963 | $75,592.26 |
| Life insurance expense included | 1,549.20 |
| | 74,043.06 |
| Legal fees | 5,897.43 |
| | 79,940.49 |
| Less recoveries | 49,590.77 |
| | 30,349.72 |

The recoveries were amounts paid to petitioner by an accounting firm and local banks in the amounts of $36,616.45 and $12,974.32, respectively.

The suit against the widow was terminated on September 3, 1963, by a "Consent Decree Dismissing Cause" which recited that the controversy in litigation had been settled and compromised and that the complainant had received the entire agreed consideration and had no further claim against the defendant.

In July 1963, the widow individually and as administratrix executed an assignment to petitioner of all "right, title and interest in and to said Policy No. 8 408 007 C * * * and all money which may be payable under said policy, excepting said three supplementary policies on the lives of the widow and two children" and she released and discharged Metropolitan accordingly. The instrument stated that:

This instrument is executed pursuant to an agreement of compromise and settlement between [petitioner] and [the employee's wife], individually, and as such Administratrix, of certain claims made by [petitioner] to the proceeds of said policy * * * and I agree that [petitioner] is entitled to said proceeds because all premiums paid on said policy were paid with funds of [petitioner]. * * *

On July 28, 1963, petitioner executed a "Release and Assignment" which stated that in consideration of the receipt from Metropolitan of $25,270.87 which represented the commuted value of the policy plus interest. Metropolitan was released from any and all claims of petitioner and petitioner assigned to the widow "all its [petitioner's] right, title and interest in and to any supplementary policies provided for in said policy."

On July 29, 1963, petitioner executed a release which stated that petitioner "subject to and contingent upon the conditions hereinafter set out" agreed to release the widow from any and all claims against her, individually and as administratrix, and to dismiss any and all suits or claims against her which petitioner had pending in any court

proceeding and to join in appropriate decrees of dismissal. The conditions set forth were the petitioner be paid by Metropolitan, the proceeds of the policy ($24,166, plus interest) and by the widow $5,000 cash. The release was to become effective "if and when these conditions are met, without any further action, or instrument being executed by [petitioner]."

On August 7, 1963, petitioner's attorney wrote a letter to petitioner, in which he stated:

As you know, the [petitioner's] case against the * * * Estate * * * and our claim to the proceeds of the insurance policy with Metropolitan Life Insurance Company * * * has been settled. Under the provisions of the settlement the [petitioner] is to receive $5,000 from [the widow] and has received $25,270.87 from Metropolitan Life Insurance Company representing the proceeds of the insurance policy in the amount of $24,166 and interest on these proceeds from the date of [the employee's] death until the date of payment in the amount of $1,104.87.

\* \* \* \* \* \* \*

The insurance proceeds were paid to the [petitioner] on our claim that the [petitioner] was entitled to the proceeds because all premiums on the policy were paid with money of the [petitioner] wrongfully embezzled from it * * *. We convinced [the widow's] attorney that we would be able to establish this fact and would be entitled to the proceeds. In the case of McConnell v. Henochsberg, 11 Tenn. App. 176, it was held that a party from whom funds are embezzled is entitled to the proceeds of the life insurance policy the same as if it were the owner of the policy, if the embezzled funds are used to pay the premiums on the policy.

Petitioner reported a taxable income of $53,496.18 on its corporate income tax return for its taxable year ended March 31, 1964. On page 4 of the return petitioner showed in "Schedule M–1.—Reconciliation of Income Per Books with Income Per Return," that it had received $24,166 as "proceeds from life insurance policy," which was not reported as taxable income. The $5,000 cash payment received from the widow was reported as "other income," as a recovery of a previously deducted embezzlement loss.

Respondent in his notice of deficiency increased petitioner's income as reported for its taxable year ended March 31, 1964, by $24,166 with the explanation that the amount shown on petitioner's income tax return as proceeds from a life insurance policy is includable in income for the reason that it represents a recovery of embezzled funds.

Petitioner contends that the policy was purchased with its funds, that a constructive trust was thereby impressed upon the policy, that petitioner elected to recover the policy rather than the funds with which it was purchased, and that, therefore, it received the proceeds of the policy as owner and not as a recovery of embezzled funds. Petitioner argues that the proceeds were received "under a life insurance contract * * * by reason of the death of the insured" and are excludable

from gross income pursuant to section 101(a). Although only one premium on the policy was paid directly with petitioner's funds by a forged check, petitioner contends that it has shown the other five payments to be from embezzled funds deposited in the employee's joint checking account or otherwise commingled with the employee's personal funds. Petitioner states that any personal funds which the employee deposited in the joint checking account should be considered as constituting a restitution of embezzled moneys previously deposited in and expended from that account.

Respondent denies that petitioner has shown that the policy was owned by it and contends that the facts of this case show that the proceeds of the policy were received by petitioner as a result of the compromise and settlement of its suit against the employee's widow.

The parties agree that unless the proceeds of the policy are excludable under section 101(a)(1),[2] they are includable in petitioner's income in its taxable year ended March 31, 1964. Even though respondent specifically contends that the proceeds of the policy were received by petitioner as a recovery of embezzled funds, both parties recognize that any reason for the receipt of the amount other than "under a life insurance contract" as an amount "paid by reason of the death of the insured" would require that the amount be includable in petitioner's income. While, as discussed hereinafter, we do not agree with petitioner in its contention that it has shown that all premiums on the policy were paid by funds embezzled from it or that the law is that were this fact shown a constructive trust would be automatically created making it entitled to the proceeds of the policy, in our opinion even if the facts and law were as petitioner contends, it would not necessarily follow that the amount paid to petitioner was "paid by reason of the death of the insured." Under petitioner's theory based on its quotation from *McConnell* v. *Henochsberg*, 11 Tenn. App. 176 (1929), petitioner was entitled to the proceeds of the policy because it was "property, purchased by one sustaining a fiduciary relation, with the funds of his employer illegally misappropriated * * * and any property so purchased * * *, is impressed with a constructive trust in favor of the cestui que trust, and that the cestui que trust is therefore entitled to receive all the profits accruing from the transaction." (11 Tenn. App. at 195) Under petitioner's theory it was entitled to the proceeds of the policy because the policy had been purchased with funds misappropriated by the employee. The value of the policy, "the property," which petitioner says was purchased with funds

---

[2] SEC. 101(a). PROCEEDS OF LIFE INSURANCE CONTRACTS PAYABLE BY REASON OF DEATH.—

    (1) GENERAL RULE.—Except as otherwise provided in paragraph (2) and in subsection (d), gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured.

misappropriated by its employee was greatly increased "by reason of the death" of the insured employee, but the reason petitioner contends it has rights in the policy is because of its purchase with funds misappropriated by the employee. In fact in the *McConnell* v. *Henochsberg* case, relied on by petitioner for its position that it is the "owner" of the policy, the court stated "that a constructive trust will be impressed on the proceeds of such insurance, where it appears that the insurance was purchased * * * with the misappropriated funds of the cestui que trust." An equitable right to "proceeds" of an insurance policy is not equivalent to the possessor of such right being owner or beneficiary of the policy who receives the amount of the proceeds "by reason of the death of the insured." Under petitioner's theory it received the proceeds "by reason of" the use by its employee of its funds misappropriated by him to purchase the insurance. The situation here even on the basis of petitioner's contention is comparable to that in *T. O. McCamant*, 32 T.C. 824, 834–835 (1959), in which we pointed out that the amounts were not paid by reason of the death of the insured but rather "were paid to petitioners by reason of the *indebtedness* of the insured to them." The instant case is distinguishable from *Durr Drug Co.* v. *United States*, 99 F. 2d 757 (C.A. 5, 1938), relied on by petitioner, for some of the same reasons that the case was distinguished from the *McCamant* case. In the *Durr Drug Co.* case, the taxpayer was named the sole beneficiary of the insurance contract and "had only to submit proof of death to the insurer in order to be entitled to the benefits of the contract." In the instant case petitioner, even under its own theory, would have to establish that the premiums on the policy were paid with funds embezzled from it in order to be entitled to the "proceeds" of the policy.

However, the facts in this case do not show that petitioner received the proceeds of the policy because of being the *cestui* of a constructive trust. Petitioner did not elect the remedy of attempting to have a constructive trust impressed upon the policy or its proceeds. Petitioner wrote the insurance company that it "would be entitled to the proceeds of all insurance on [the employee's] life which was paid for by money wrongfully obtained from our client." So far as the record shows, any claims by petitioner to "the proceeds" of the employee's insurance contracts as between petitioner and the insurance company stopped with this letter. Thereafter, petitioner sued the employee's widow and received the proceeds of the insurance contract under its settlement with her.

Petitioner argues that the assignment and release executed by the employee's widow, which recites that the widow *agrees* that petitioner is entitled to the proceeds because "all premiums paid on said policy were paid with funds" of petitioner, supports its claim that it was

equitable owner of the policy. This "agreement" by the widow was clearly a part of the settlement of the suit against her by petitioner. This fact is shown by the release executed by petitioner on July 29, 1963, the day following the execution of the assignment and release by the widow. The widow's agreement as part of a settlement that petitioner is entitled to "the proceeds" of the policy because all premiums were paid with its funds does not cause petitioner to receive those proceeds "by reason of the death of the insured" but rather shows that it received them as part of a settlement of its claim for restitution of embezzled funds.

The fact that a claim is made to proceeds of an insurance contract and a settlement of such claim results does not cause the amount so received to be received "under a life insurance contract" by reason of "the death of the insured." See *Marian Essenfeld*, 37 T.C. 117 (1961), aff'd. 311 F. 2d 208 (C.A. 2, 1962), and *Salmonson* v. *United States*, an unreported case (E.D. Wash. 1963, 11 A.F.T.R. 2d 1568, 63–1 U.S.T.C. par. 9481).

Under the settlement petitioner obtained from the widow sufficient assets to reimburse it for the remaining unreimbursed part of the amount it claimed on its 1963 Federal income tax return as an embezzlement loss and no more, although it appears that the widow had some other assets which would have provided greater satisfaction. Had petitioner been entitled to the insurance proceeds under its constructive-trust theory, elected to have a constructive trust impressed, and been successful in having such a trust impressed by a local court, then the insurance proceeds would not have been involved in its suit against the widow and theoretically petitioner could have recovered from her as well as obtaining the insurance proceeds from the insurance company. Whatever petitioner's reason for its decision, it did not attempt to obtain the proceeds of the insurance policy by impressing a constructive trust thereon but received them by way of a settlement with the widow, leaving to her the part of the policy insuring her life and that of her children and dismissing its suit against her. Petitioner's reason may have been that it did not believe it would be able to show in court that all funds with which the policy was purchased were embezzled from it. In the instant case we conclude from the facts we have set forth that petitioner has not made this showing. While in a suit to impress a constructive trust if "equity demanded" a presumption favorable to petitioner as to "commingling" might be accepted, petitioner has pointed to nothing which would assure that "equity" would require that the local court accept this presumption had petitioner chosen to pursue the equitable remedy of attempting to impress a constructive trust. As the Supreme Court stated in *Healy* v. *Commissioner*, 345 U.S. 278 (1953), when considering a contention

that excessive salaries paid to corporate officers should not be includable in their taxable income in the year of receipt:

A constructive trust is a fiction imposed as an equitable device for achieving justice.[11] It lacks the attributes of true trust, and is not based on any intention of the parties. * * *

[11] 3 Scott, Trusts, sec. 461.1 ; 3 Bogert, Trusts and Trustees, sec. 471.

Even if the widow's action could be interpreted as an agreement that petitioner was equitable owner of the policy under a constructive trust, her agreement would not create such a trust.

We agree with respondent that petitioner's property interest in the proceeds of the insurance policy or the policy itself arose at the time of and relates back only to the agreement of compromise and settlement. If petitioner ever had a property interest in the policy, as distinguished from the proceeds thereof, such interest arose only on the assignment of the policy to it by the employee's widow. Petitioner sued the widow for restitution of embezzled funds or liens on or to be declared the owner of property purchased with such embezzled funds. The case was settled by petitioner's receiving the amount of its otherwise unrecovered embezzled funds, or, in effect, by its obtaining restitution from the widow. See *Grossman & Sons, Inc.*, 48 T.C. 15 (1967).

We conclude that the policy or the proceeds thereof were received by petitioner in restitution of embezzled funds and that the cash in the amount of $25,270.87 so received must be restored to income to the extent of $24,166 because of the deduction previously taken for the embezzlement loss. The proceeds of the policy were received by reason of the settlement and not by reason of the death of the insured and therefore are not excludable from petitioner's income under section 101(a).

*Decision will be entered for respondent.*