M. LUCILE HARRISON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4027–70—4030–70, 4033–70, 6798–70. Filed January 29, 1973.

*Roger C. Cohen, Thomas C. Seawell,* and *Frank A. Brame III,* for the petitioners.

*Arthur B. Bleecher,* for the respondent.

FAY, *Judge:* Respondent determined deficiencies in the Federal income taxes of the petitioners, as follows:

| Petitioners | Docket No. | Year | Deficiency | Total |
|---|---|---|---|---|
| M. Lucile Harrison | 4027–70 | 1965<br>1966 | $17,093.69<br>71,618.84 | $88,712.53 |
| Edward G. Panter and Myrtle P. Panter | 4028–70 | 1965<br>1966 | 12,148.32<br>53,184.86 | 65,333.18 |
| Charles A. Roth and Patricia Roth | 4029–70 | 1965<br>1965<br>1967 | [1] 689.31<br>4,595.43<br>59.27 | 5,344.01 |
| Estate of Everett R. Berglund, deceased, Virginia I. Berglund, administratrix | 4030–70 | 1965<br>1966 | 5,436.51<br>22,155.37 | 27,591.88 |
| Henry C. Cleveland and Priscilla A. Cleveland | 4033–70 | 1965<br>1966 | 9,494.33<br>17,412.85 | 26,907.18 |
| Deward A. Childre and Martha J. Childre | 6798–70 | 1963<br>1964<br>1966 | 471.12<br>28.92<br>5,648.93 | 6,148.97 |
| Total | | | | 220,037.75 |

[1] Addition to tax, sec. 6651(a), I.R.C. 1954.

[1] Cases of the following petitioners are consolidated herewith: Edward G. Panter and Myrtle P. Panter, docket No. 4028–70; Charles A. Roth and Patricia Roth, docket No. 4029–70; Estate of Everett R. Berglund, Deceased, Virginia I. Berglund, Administratrix, docket No. 4030–70; Henry C. Cleveland and Priscilla A. Cleveland, docket No. 4033–70; and Deward A. Childre and Martha J. Childre, docket No. 6798–70.

The issues for decision are whether insurance proceeds were received by reason of the death of the insured and excludable under section 101(a), I.R.C. 1954,[2] or as income from the compromise and settlement of a lawsuit; further, whether any amount of such proceeds was received by petitioners' corporation in its capacity as a creditor of the insured; and finally, whether petitioners are entitled to a bad debt deduction.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

All petitioners, with the exception of Deward A. Childre and Martha J. Childre, resided in Colorado when the petitions were filed. Their Federal income tax returns for all years in controversy were filed on the cash basis of accounting with the district director of internal revenue, Denver, Colo.

Petitioners Deward A. Childre and Martha J. Childre resided in Texas when their petition was filed. Their Federal income tax returns for all years in controversy were filed on the cash basis of accounting with the district director of internal revenue, Dallas, Tex. Petitioners Myrtle P. Panter, Patricia Roth, Priscilla A. Cleveland, and Martha J. Childre are parties only by reason of having filed joint income tax returns with their respective husbands.

In 1961, M. Lucile Harrison, Edward G. Panter, Charles A. Roth, Henry C. Cleveland, and Everett R. Berglund formed a partnership called Debentures Associates (hereinafter referred to as the partnership). The partnership in March 1962 caused to be formed a Colorado corporation named Twin Lakes Land & Cattle Co., Inc., which served solely as a nominee corporation to hold title to various of the partnership's investment properties. In January 1964, Twin Lakes Land & Cattle Co., Inc.'s, name was changed to Twin Lakes Corp. (hereinafter referred to as Twin Lakes), and at or about the same time the partners of Debentures Associates transferred their partnership interests to Twin Lakes in a tax-free exchange for all the common stock of the corporation. Accordingly, Twin Lakes then ceased to be a nominee corporation and became an operating corporation. The original stockholders continued to own in varying percentages all of the shares of Twin Lakes during all the years in question (except that in 1966 petitioner Deward A. Childre purchased the stock of petitioner Charles A. Roth).

Petitioners were, during one or more of the taxable years in issue,

---

[2] All section references are to the Internal Revenue Code of 1954.

shareholders in Twin Lakes. Their holdings and dates of acquisition and disposition of Twin Lakes' stock are stipulated.

Twin Lakes was a subchapter S corporation pursuant to section 1371 *et seq.* of the Internal Revenue Code of 1954 throughout 1965 and 1966.

Chester M. Mason (hereinafter referred to as Mason) owned 100 percent of the stock of Mt. Elbert Plamor Ranch, Inc. (hereinafter referred to as Mt. Elbert), from its inception until the time of his death.

On August 15, 1961, Mt. Elbert entered into an agreement to purchase approximately 540 acres, all of which were a part of the Hayden Ranch. The essence of this agreement was that Mason and Mt. Elbert were to deliver a $300,000 promissory note (Mason's note) to the sellers of the aforementioned portion of the Hayden Ranch and then Mason was to develop and subdivide the property in question. The note was to be paid off from the proceeds generated by the subdivision and sale of the property. The agreement originally provided that 50 percent of the total amounts collected from the sale of certain lots would be paid to the sellers.[3] Mt. Elbert and Mason cosigned the $300,000 non-interest-bearing promissory note. The note had a maturity date of December 31, 1969. Even though Mason cosigned the note, the agreement specifically provided that Mason's individual liability on the note was limited to the value of the capital stock owned by him in Mt. Elbert.

The agreement in pertinent part reads as follows:

As collateral security for the payment of said note, Mason shall pledge and deliver to first parties all of the capital stock of the corporation issued to him, *it being expressly understood and agreed that Mason's individual liability as a co-maker of said note shall be limited to the extent of the value of said stock.* When said promissory note has been paid in full according to its terms, then all of said stock shall be returned to Mason free and clear of any and all encumbrances thereon.

It is agreed that in the event the corporation shall fail to pay said promissory note according to its terms, or in the event the corporation shall violate any of the terms or conditions of this agreement, then in that event first parties may, at their option, elect to foreclose said capital stock and retain the same as their sole and separate property. In the event first parties elect to retain said stock, the fair market value of said stock at the time of such default shall be determined by the certified public accountant then retained by the corporation and his determination shall be conclusive. In the event the value of said stock as so determined is not sufficient to satisfy the said promissory note in full, then first parties may, at their option, retain said stock and the said fair market value as determined shall be applied against the unpaid principal balance of said promissory note, *and the corporation (but not Mason) shall be liable for any deficiency.* * * * [Emphasis added.]

---

[3] This agreement was later modified to provide for only one-third of the receipts to be paid to the holders of the note.

The petitioners' partnership was originally formed in 1961 to purchase stocks and bonds. In 1962 the partners became interested in investing in real estate and the partnership initially acquired four parcels of property in the Leadville, Colo., area. One of the acquired properties was the balance of the Hayden Ranch. On or about June 1, 1962, the partnership acquired the remaining portion of the Hayden Ranch and Mason's $300,000 promissory note both for a total consideration of $450,000. On its books and records, the partnership allocated $220,000 of the purchase price to the promissory note having a face value of $300,000 and $230,000 to the ranchland. The amount of $220,000 is stipulated to be the cost basis of the note.

The partners' original intent in acquiring the ranches was to perfect, by litigation, the water rights attaching to the properties and to sell off the perfected water rights at a profit. The ranches were then to be used for limited agricultural purposes. Three real estate brokers were to participate in the costs of the litigation involved in perfecting title to the water rights. These brokers were unable to pay their share of the expenses, and the partnership bought out the brokers' interests. After this chain of events, the partners, who were aware of Mason's plan to subdivide and develop his half of the ranch, decided to hold their property for sale in connection with Mason's development plan. The partnership was not in a position to promote and sell property but the partners were quite impressed with Mason's ability as an energetic and resourceful real estate developer, and they felt they could profitably dispose of the property by either conveying it to Mason as his plans were brought to fruition or by developing their own property along with Mason's. In fact, once the partners were convinced of the integrity of Mason's efforts, they went to considerable expense and had a master plan of development drawn up for the property in the area.

Shortly after the partners decided on the above course of action, insurance policies were taken out on the lives of the partners and Mason. At this time the partners had a large investment in the Hayden Ranch. They believed that the ranch property would eventually develop into a highly profitable venture as a result of Mason's efforts. In order to protect their expectation of gain which would result chiefly from Mason's efforts, the partnership took out a life insurance policy on Mason's life in the amount of $1 million with the Texas Reserve Life Insurance Co. The amount of insurance was later reduced to a $500,000 policy purchased through a number of insurance companies and ultimately carried by North American Life & Casualty Co. (North American). Twin Lakes was the owner and beneficiary of the North American policy, and neither the policy nor the application for the policy makes reference to any intended security or "creditor's

life" purpose. Furthermore, neither the partnership in 1963 nor Twin Lakes in 1964 deducted on its Federal income tax returns the premiums paid for the life insurance on Mason's life. In all but one of the applications for the policies on Mason's life, Mason was characterized either as a partner or employee of either the partnership or Twin Lakes. In fact, Mason was never a partner, employee, shareholder, officer, or director of Twin Lakes at any time.

Mason died on November 22, 1964, as the result of an aircraft accident on Buffalo Peak, near Leadville, Colo. North American resisted payment on the $500,000 policy, alleging among other things that Mason had misrepresented his intention with respect to flying private aircraft, and Twin Lakes sued North American for the policy proceeds.

Lester S. Ross, an officer of Mt. Elbert, was appointed administrator of Mason's estate, and both the Estate of Chester M. Mason and Mt. Elbert made claims to North American for part of the policy proceeds. Twin Lakes joined them in its suit against North American. North American then compromised the disputed claim for $450,000, which was paid in the nature of an interpleader, leaving Twin Lakes, Mt. Elbert, and Mason's estate to contest the rightful ownership of the proceeds. The three litigants took the following positions regarding the $450,000 in proceeds: (a) Twin Lakes alleged it was entitled to all of the proceeds without any application to the indebtedness of Mt. Elbert; (b) Mt. Elbert claimed it was entitled to have its indebtedness to Twin Lakes paid out of the proceeds; and (c) the estate of Mason claimed it was entitled to the balance of the proceeds after payment of the indebtedness owed by Mt. Elbert. In essence, Ross, acting on behalf of the estate and Mt. Elbert, was "after all we could get."

At the time of the dispute, Twin Lakes was severely pressed for cash and had currently in excess of $600,000 of indebtedness. Twin Lakes was anxious to obtain the cash proceeds of the insurance policy and was intent on avoiding excess legal expenses and the delayed payment of proceeds which would result from extended litigation.

The original $300,000 note was still being paid down and was worth substantially in excess of $50,000. However, there was some question as to whether the note could have been paid off in full and just when such a payment could have been accomplished.

Just prior to trial in the above proceedings, a settlement agreement was reached in principle. The specifics of this agreement are as follows:

(a) Of the $450,000 insurance proceeds, the amount of $50,000 was to be paid to Mt. Elbert, and then immediately paid over to Twin

Lakes, with the remaining amount being paid over directly to Twin Lakes;

(b) The balance on the note in the original amount of $300,000, then paid down to $193,974.28 face value, was to be canceled; [4]

(c) The capital stock of Mt. Elbert, held by Twin Lakes to secure payment on the $300,000 note, was to be given to the estate of Chester M. Mason;

(d) Just prior to Mason's death, Mason purchased a portion of property known as Eagle's Nest from Twin Lakes for a $75,000 note. One element of the settlement was that the Eagle's Nest transaction would be reversed with cancellation of the note by Twin Lakes and its return to Mt. Elbert. In furtherance of this aspect of the settlement, there was a conveyance of the Eagle's Nest property by Mt. Elbert back to Twin Lakes, repayment by Twin Lakes of $1,700 to Mt. Elbert for payments made on the $75,000 note, and the payment by Twin Lakes of $4,487.50 to Mt. Elbert for engineering expense incurred in surveying the Eagle's Nest property;

(e) The claim of Twin Lakes filed with the Probate Court in the estate of Mason in the total amount of $297,681.83, the balance due on the two promissory notes, was to be withdrawn; and

(f) Deeds of trust on platted land located in the tract originally purchased by Mason out of a portion of the Hayden Ranch, which were given by Mt. Elbert to Twin Lakes and M. Lucile Harrison to aid in the making of loans by them, were to be canceled and releases filed of record.

Twin Lakes treated this settlement as if it were comprised of two distinct separate parts, the first part being a payment of $50,000 to Mt. Elbert and the estate in order to secure the remaining $400,000 insurance proceeds free from claims, and the second part being Mt. Elbert's payment of $50,000 to Twin Lakes as a settlement on the $193,974.28 balance on the note owed to Twin Lakes. In fact, the settlement was not two separate distinct steps. We find that the actual economic effect of this settlement was that Twin Lakes agreed to forgive the entire outstanding debt on the original $300,000 note in exchange for Mt. Elbert's and the estate's agreement not to further contest Twin Lakes' rights to the insurance money.

In accordance with its view of the above, Twin Lakes on its 1966 Federal income tax return claimed a bad debt deduction in the amount

---

[4] On the date of Mason's death, Nov. 22, 1964, there was due and owing on the $300,000 promissory note $224,381.83, the difference of $75,618.17 being amounts paid to that date.

On the date the lawsuit was settled, Jan. 11, 1966, there was due and owing on the $300,000 promissory note $193,974.28, an additional $30,407.55 having been paid from the date of death to the date of settlement, for total payments on the note of $106,025.72. Accordingly, the cost basis of the note at the time of the settlement was $113,974.28, having been reduced to that figure from $220,000.

of $63,974.28 ($113,974.28 basis in the note −$50,000 payment) and the receipt of $400,000 in tax-free insurance proceeds. No discount income was reported in respect to the note. Mt. Elbert on its 1966 Federal income tax return reported $50,000 as tax-free insurance proceeds and reduced its basis in other assets by $143,974.28 as the alternative under section 108 of the Code to reporting cancellation of indebtedness income. The Commissioner in his notice of deficiency increased petitioners' taxable income to reflect the following two alternative positions regarding the foregoing transactions:

*Alternative Position 1.* It is determined that the insurance proceeds of $400,000 constituted income from a wagering contract and that the proceeds less premiums of $2,475, or $397,525 is taxable as ordinary income under section 61 of the Internal Revenue Code. The bad debt deduction of $63,974.28 is allowable as claimed.

*Alternative Position 2.* (a) It is determined that a valid insurance contract existed to the extent of the indebtedness owed by Mt. Elbert Plamor Ranch, Inc., $143,974.28. The receivable was collected in full and discount income of $80,000 was realized. The balance of the insurance proceeds, $256,025.72, less premiums paid of $2,475 was realized from a wagering contract and is includable in income under section 61 of the Internal Revenue Code in the amount of $253,550.72.

| | |
|---|---:|
| Discount income | $80,000.00 |
| Wagering contract income | 253,550.72 |
| Total income | 333,550.72 |

(b) It is determined that the bad debt deduction of $63,974.28 which you claimed with respect to the amounts owed by Mt. Elbert Plamor Ranch, Inc., and/or Chester M. Mason is not allowable because the debt was collected. See adjustment (a) above.

### OPINION

It is well established that the incidence of taxation is governed by the substance rather than the form of the transaction, see *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), and *Gregory* v. *Helvering*, 293 U.S. 465 (1935), and this Court has not hesitated to recharacterize a settlement which consists of a series of closely related, integrated steps so that the economic effect of these steps might be properly reflected for income tax purposes. See *C. Ted Brady*, 35 T.C. 311 (1960).

The case at bar requires close scrutiny and substantial recharacterization in order to reflect the proper conclusion as to the consequences of the various elements of the settlement herein. The respondent in his deficiency notice took alternative positions in the present case. In both alternatives, substantial sums were treated as income from wagering contracts. Under the second alternative only part of the deficiency was

attributable to wagering income while the remainder was attributable to discount income and the disallowance of a bad debt deduction.

It is true that when one takes out a life insurance policy on the life of another with no insurable interest in that life, the policy is not a life insurance contract within the generally accepted meaning of that phrase but a wagering agreement and the proceeds thereof are not excluded under section 101(a). See *Atlantic Oil Co.* v. *Patterson*, 331 F. 2d 516 (C.A. 5, 1964), and cf. *Ducros* v. *Commissioner*, 272 F. 2d 49 (C.A. 6, 1959), reversing 30 T.C. 1337 (1958). However, respondent abandoned this line of reasoning as a basis for the deficiency. Instead, at the trial and on brief, he relied essentially on *Tennessee Foundry & Machinery Co.*, 48 T.C. 419 (1967), affd. 399 F. 2d 156 (C.A. 6, 1968), and contended that a substantial part of the sum received by petitioners was income which arose from the compromise and settlement of a lawsuit and not excludable under section 101(a).[5]

Because of the complexity of the factual situation, a brief summary of events is helpful before considering the various points at issue. Petitioners, through their subchapter S corporation, Twin Lakes, had a substantial investment in real estate in Colorado. Though the property was originally purchased primarily for its water rights and secondarily for agricultural purposes, the petitioners ultimately decided it would be much more profitable to hold the property for sale in connection with Chester M. Mason's plans for major development of the entire area. Mason was an energetic and resourceful real estate developer, and the petitioners, because of their mutual interests in the development of the area, had a pecuniary interest in Mason's continued life. Mason's development efforts would cause an appreciation in value of all of the land in the general area. Because of Mason's importance as the "key man" in the development, the petitioners eventually insured his life for $500,000. Though the petitioners held a note with a face value of $300,000 which Mason had cosigned, the insurance was not taken out to secure the payment of the note. This note was already secured by the property owned by Mt. Elbert, and Mason's individual liability on this note was limited to the value of his capital stock ownership in Mt. Elbert. The petitioners at all times considered this insurance policy to be "key man" insurance. Twin Lakes did not deduct as business expenses the premiums paid on the policy.[6]

---

[5] Respondent has not completely changed his position from that of the deficiency notice. He still contends in the alternative that a portion of the sum is attributable to discount income and disallowance of the bad debt deduction. The basis for this alternative theory will be discussed in the latter part of this opinion.

[6] Had the petitioners considered this to be a "creditor" life insurance policy, the premiums would have been deductible as a business expense. Respondent's position as to this is expressed in Rev. Rul. 70–254, 1970–1 C.B. 31. See also *Charleston National Bank*, 20 T.C. 253 (1953), affd. 213 F. 2d 45 (C.A. 4, 1954).

Mason died and the petitioners presented their claim to the insurance company. At this time a series of events took place. The insurance company resisted payment on the grounds that there had been a misrepresentation in the application. Lester Ross, as administrator of Mason's estate and an officer in Mt. Elbert, made a claim to the proceeds. Essentially, Ross was intent on preserving both the estate and the corporation and attempted to get the most benefit he could for these entities.

The insurance company finally agreed to settle the claim for $450,000. This was paid in the nature of an interpleader. Twin Lakes, Mt. Elbert, and Mason's estate then planned to contest their respective rights to the $450,000, but prior to trial a settlement was reached. The essence of the settlement was that Twin Lakes would receive the entire $450,000 insurance proceeds and Mt. Elbert was excused from its remaining liability under the note. The benefit to the estate, of course, was that it now held Mt. Elbert's stock free of any liability under the note. Just prior to trial, the petitioners believed that Twin Lakes was in an extremely good position to win all of the insurance proceeds and still collect on the note. However, since it was in need of immediate funds and faced with the possibility of incurring substantial legal fees for the initial trial and any subsequent appeals and of being denied immediate access to the insurance proceeds, Twin Lakes made a sound business judgment to excuse any further liability under the note in exchange for a release of all claims to the insurance proceeds and the immediate right to all the funds.

The settlement was structured so that Twin Lakes would not only receive all of the insurance proceeds but it could also claim a substantial bad debt deduction. It is our belief that the settlement reflected a quid pro quo, the release of liability on the note for a release of all claims to the insurance money. The actual transfers made under the settlement agreement were transactions of form only.

With the foregoing in mind, we will now review the applicable law regarding the appropriate Federal income tax treatment of the various transactions.

Section 101(a) provides for an exclusion of amounts received under a life insurance contract, if such amounts are paid by reason of the death of the insured.[7] While the term "key man" life insurance is relatively new, at least as early as 1924 the Supreme Court (without terming it "key man") recognized that insurance based on a keyman relationship was within the exclusionary provisions of section 101(a). See *United States* v. *Supplee-Biddle Co.*, 265 U.S. 189 (1924).

---

[7] SEC. 101. CERTAIN DEATH BENEFITS.

(a) PROCEEDS OF LIFE INSURANCE CONTRACTS PAYABLE BY REASON OF DEATH.—

(1) GENERAL RULE.—Except as otherwise provided in paragraph (2) and in subsection (d), gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured.

The petitioners claim that as owners and beneficiaries of a "key man" life insurance policy on Mason's life, they are entitled to the proceeds of that policy tax free under section 101(a). We are in complete agreement.

Twin Lakes was the owner and beneficiary of a life insurance policy. It had an insurable interest in the life of the insured based on its mutual business interests and it collected the proceeds by reason of the death of the insured.

All of the requirements of section 101(a) were met. In order for respondent to prevail in any of its alternative theories, there must be some evidence that petitioners had no insurable interest in Mason's life beyond that of the creditor-debtor interest. On the contrary, petitioners have convinced this Court that they had an insurable interest in Mason based on a keyman relationship.

An insurable interest has been defined as "any reasonable expectation of pecuniary benefit or advantage from the continued life of another." *Conn. Mut. Life Ins. Co.* v. *Schaefer*, 94 U.S. 457, 460 (1876).[8] Twin Lakes possessed exactly such an interest in Mason's life.

As to the necessary elements of a "key man" interest, the State of Colorado has no law directly in point.[9] However, the reasoning in the case of *Poland* v. *Fisher's Estate*, 329 S.W. 2d 768 (Mo. 1959), is very appropriate to the present case. In that case, a life insurance policy was in existence and the deceased-insured (Fisher) was a dealer in livestock whose business consisted of purchasing livestock and selling it through the facilities of the beneficiary (Poland). Poland received a great deal of business from Fisher and from the beginning of their business relationship Poland loaned the deceased money to insure his steady business. At the time of his death, the decedent was indebted to the beneficiary. The only business connection between the parties was that the deceased used the beneficiary's facilities in the sale and handling of livestock and Poland's business profited handsomely from this relationship. Fisher was not an employee, partner, or a party to a joint enterprise with Poland. On Fisher's death, the beneficiary collected the proceeds of the insurance policy and also filed a claim against Fisher's estate for the collection of the indebtedness. The estate counterclaimed on the theory that either the beneficiary had no insurable interest or his insurable interest was limited to

---

[8] See also 3 Couch, Insurance 2d 226–227.

[9] One important relevant factor is that under Colorado law only the insurer may assert the lack of an insurable interest. See *Mullenax* v. *National Reserve Life Insurance Co.*, 29 Colo. 418, 485 P. 2d 137, 139 (Ct. App. 1971).

In the present case the insurance company was certainly not anxious to pay the benefits under the policy, yet at no time did it resist payment based on the idea of no insurable interest. Nor did the insurance company attempt to make a limited payment on the contention that there was an insurable interest limited only to the extent of the debtor-creditor relationship.

the amount of the debt and the insurance proceeds should be so applied. The court held that the beneficiary had an insurable interest which allowed him to retain the proceeds of the policy irrespective of his right to collect the full amount of the debt. In determining the nature of the beneficiary's interest, the court stated: "Whether Poland procured the insurance as a creditor of Fisher or as that of a 'business associate' must be determined from the evidence." The court, citing 44 C.J.S. Insurance, section 203, at 903, then went on to uphold the trial court's finding that the insurable interest was that of a business associate and not that of a creditor.

an insurable interest in the life of a person is an interest in having the life continue; a person has an insurable interest in the life of another where there is a reasonable probability that he will gain by the latter's remaining alive or lose by his death. * * *

This statement is certainly applicable to the petitioners' insurable interest in the case at bar.

The respondent's reliance on the case of *Bosma* v. *Evans*, 96 Colo. 504, 44 P. 2d 511 (1935), is misplaced. In that case a Colorado court held that where an insurance policy is assigned to a creditor as security and there is a great disparity between the face of the policy and the debt, the transaction is so much of a speculation that when debt, premiums, expense, and interest are deducted the balance must go to the beneficiary. The distinguishing feature in that case is that there was a finding of fact that the creditor had no insurable interest in the life of the decedent upon which to claim an interest in the entire policy other than that of a creditor. In the case at bar, Twin Lakes had an insurable interest separate and apart from its creditor interest, and its claim to the whole of the proceeds is based on this separate insurable interest.

Having found that Twin Lakes was the owner and beneficiary of the North American policy and that Twin Lakes did in fact have an insurable interest in Mason's life, we cannot agree with the respondent's contention that *Tennessee Foundry* is applicable and that the funds represent income received from the compromise and settlement of a lawsuit not subject to the exclusionary provisions of section 101 (a)'(1).[10]

The *Tennessee Foundry* case is distinguishable from the case at bar. To best review the distinctions between that case and the case at bar, it is appropriate to present a detailed review of the facts and holding of that case. In the *Tennessee Foundry* case, the petitioner's employee

[10] The petitioners claim that respondent's contention that the funds represent income received from the compromise and settlement of a lawsuit is a new issue which respondent raised at trial and the burden of proof as to this issue is placed on him. It is clear from our holding that petitioners have won this issue regardless of any change in the burden of proof and we therefore need not direct ourselves to the question.

embezzled money from the petitioner between the years 1956 and 1962. In 1962 the employee committed suicide, leaving the proceeds from certain insurance policies to his wife and mother as beneficiaries. The petitioner audited its books and discovered that it "had suffered a loss of 'approximately $135,000' by forgery, embezzlement, and breach of trust" by the employee. It was also determined that certain of the embezzled funds were used both directly and indirectly to pay for the premiums on one of the life insurance policies held by the employee. After receiving certain amounts by way of recovery from an accounting firm and local banks, the petitioner claimed an embezzlement loss in its fiscal year ended March 31, 1963, of $30,349.72.

The petitioner filed suit in September 1962 against the employee's widow, individually and as administratrix, in an attempt to recoup its embezzlement losses. This suit was terminated in September of 1963 by way of a compromise and settlement. The petitioner released all further claims against the widow in exchange for an assignment of certain rights to one of the insurance policies and for $5,000 in cash. The petitioner received this cash and the commuted value of the policy plus interest from the Metropolitan Life Insurance Co. On its corporate tax return for the taxable year ended March 31, 1964, the petitioner reported the $5,000 cash payment as a recovery of a previously deducted embezzzlement loss. It reported the commuted value of the life insurance policy ($24,166) received from Metropolitan Life as life insurance proceeds excludable from income pursuant to section 101 (a). This Court held these proceeds to be an amount representing a recovery of embezzled funds. The exclusion produced by section 101 (a) was held inapplicable.

Section 101 (a) provides for an exclusion for amounts received under a life insurance contract, if such amounts are paid by reason of the death of the insured. In the *Tennessee Foundry* case, the petitioner was not found to be the owner or beneficiary of the insurance contract. At no time did it have an insurable interest in the insured. Rather, the petitioner's property interest in the proceeds of the insurance policy arose only at the time of the compromise and this compromise was based on the petitioner's claim for the restitution of the embezzled funds.

*Tennessee Foundry*, on these facts, held that the petitioner, in settlement, did not receive the funds by reason of the insured's death but instead it received funds by reason of its claim for the restitution of embezzled funds.

When a third-party claimant is not the owner or beneficiary of a policy and asserts a right to insurance proceeds, that claimant must show additional circumstances other than the death of the insured to

establish an interest in the policy. In essence, *Tennessee Foundry* stands for the proposition that since the third-party claimant's interest is dependent on these additional circumstances, the third-party claimant's right does not arise "by reason of the death of the insured," but by reason of these additional circumstances. Consequently, funds received by a third party in settlement by virtue of these additional circumstances are not within the purview of section 101(a).

In the present case, Twin Lakes is the owner and beneficiary of the insurance policy. Twin Lakes had an insurable interest in the insured's life and were it not for a third-party's (i.e., Mt. Elbert and Mason's estate) claim to the proceeds, Twin Lakes would have received the funds from the insurance company by reason of Mason's death. If we were to follow respondent's wishes and apply the doctrine of *Tennessee Foundry* to proceeds received by the owner and beneficiary of a policy whenever potential litigation, either frivolous or substantive, forces that owner and beneficiary to settle and compromise his claim for the proceeds, we would in effect either read the benefit provided by section 101(a) out of the Internal Revenue Code or promote costly litigation as opposed to amicable settlement. Indeed, the *Tennessee Foundry* case itself seems to point out the distinction between a case in which the owner and beneficiary of a policy receives proceeds as opposed to a receipt of funds by a third-party claimant.

An equitable right to "proceeds" of an insurance policy is not equivalent to the possessor of such right being owner or beneficiary of the policy who receives the amount of the proceeds "by reason of the death of the insured." [*Tennessee Foundry & Machinery Co., supra* at 428.]

Respondent in his second alternative position relied on a separate line of reasoning in addition to his argument based on the *Tennessee Foundry* case. According to this alternative position, the proceeds of the policy received by Twin Lakes consisted of two separate elements.

As to the first element, respondent relies on cases such as *T. O. Mc-Camant*, 32 T.C. 824 (1959), and *Landfield Finance Co. v. United States*, 418 F. 2d 172 (C.A. 7, 1969), and contends that $193,974.28 (the face value of the note) of the proceeds were paid as a form of "creditor's insurance" and the entire note was paid in full. Therefore, respondent determined that there was no bad debt deduction and petitioners must include $80,000 of discount income as taxable income in the year 1966.[11] See *Morton Liftin*, 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963). Respondent then considered any amounts in excess of the amount received by Twin Lakes as a creditor as amounts received by way of compromise and includable in income according to *Tennessee Foundry*.

[11] This $80,000 is the difference between $193,974.28, the face value of the note at the time of settlement, and $113,974.28, the basis of the note at that time.

In *McCamant*, a debtor (Noill) voluntarily took out an insurance policy and named as beneficiaries "T. O. McCamant [the plaintiff and creditor of the insured] and the Farmers and Merchants National Bank of Abilene, Texas, *Creditors as their respective interests may appear*." (Emphasis supplied.) In 1952, debts and losses attributable to sales and loans to Noill totaling $21,092.34 [12] were charged off by McCamant. In July of 1953, Noill died and the aforementioned insurance policy was in force. At the insurance company's request, McCamant submitted an affidavit notifying the insurance company that Noill owed McCamant $21,092.34 at his death. McCamant was paid $18,679.98 under the provisions of the policy in satisfaction of indebtedness. McCamant did not include all of this amount in his taxable income in the years of recovery, claiming that the amounts were exempt from taxation by section 22(b)(1)(A) of the Internal Revenue Code of 1939 (precursor to section 101(a) of the 1954 Code). Respondent successfully sought to include the recovered amounts in income to the extent that the petitioner derived a tax benefit from deductions attributable thereto in prior years. The Court in *McCamant* found that McCamant had received the proceeds by reason of Noill's indebtedness to him, not by reason of Noill's death, and under such circumstances the exclusionary provisions of section 22(b)(1)(A) were inapplicable.

It is * * * apparent that before McCamant could take under the provisions of the insurance contract, he not only had to establish Noill's death, but also had to prove that at the time of death, Noill was indebted to him. Without proof of this indebtedness, McCamant was entitled to no part of the benefits provided for by the contract. Thus, the amounts received by petitioners under the Noill insurance contract were not "paid by reason of the *death* of the insured," * * * Rather, the funds were paid to petitioners by reason of the *indebtedness* of the insured to them. * * * [*T. O. McCamant, supra* at 834–835.]

The factual situation in *Landfield*, also relied on by respondent, is similar to that in *McCamant*. The reasoning in both of these cases is distinguishable from the present case.

Twin Lakes was the owner and beneficiary of the policy in question. Its insurable interest did not arise by reason of Mason's indebtedness but by reason of Mason's "key man" relationship with Twin Lakes. The corporation never considered the policy as creditor's life insurance and refrained from deducting the premiums which it would have been entitled to do had it intended this policy to be a creditor's insurance policy. Twin Lakes, as owner and beneficiary of a "key man" policy was entitled to and did in fact collect and retain the policy proceeds

---

[12] This figure consists of the following:

| | |
|---|---:|
| Balance due on open account | $16,051.93 |
| Loss on repossession | 2,212.00 |
| Do | 1,704.16 |
| Personal note to McCamant | 874.25 |
| Personal check McCamant | 250.00 |

which were "paid by reason of the death of the insured." Twin Lakes' rights were not at all dependent on a showing of Mason's indebtedness to Twin Lakes. In fact, it is quite apparent from the evidence offered that there was no personal liability on Mason's part other than the value of his stock in Mt. Elbert. If Mt. Elbert, the primary obligor, failed to meet its obligations, its stock would be of little value. Therefore, Mason was a debtor of Twin Lakes in only a limited sense of the word.

The *McCamant* case by way of dictum seems to have distinguished itself from a situation somewhat like the case at bar. At page 835, the Court asserted that the funds in question were paid by reason of indebtedness and not by reason of the death of the insured, and went on to say:

This is not the case of a creditor who has been named the sole beneficiary of a contract of insurance on his debtor's life and is the owner of such policy and its proceeds regardless of the existence of indebtedness at the time of death. * * *

Finally, we come to the actual effects of the settlement on the bad debt deduction.[13] The petitioners argue that the settlement consisted of a series of distinct, separate transactions arrived at in arm's-length bargaining and the individual steps should be honored.[14] They claim that Twin Lakes gave Mason's estate and Mt. Elbert $50,000 of the insurance proceeds to eliminate their claims to the remaining proceeds. Twin Lakes then found itself to be the holder of a note with a remaining unpaid balance of $193,974.28. Twin Lakes estimated the present value of this non-interest-bearing note which had 4 more years to maturity to be $50,000. It is petitioners' contention that Twin Lakes therefore accepted $50,000 for the note and it was entitled to a bad debt deduction for the difference between its basis in the note ($113,-974.28) and the $50,000 payment.

---

[13] Petitioners have argued that the bad debt deduction was not properly put in issue due to the conflicting statements made in respondent's alternative positions in the deficiency notices. We cannot agree with this contention for we have consistently held that the respondent may take inconsistent positions for the purpose of protecting the revenue without causing his determinations to lose their presumptive correctness. See *Leon R. Meyer*, 46 T.C. 65, 82 (1966), affirmed as to this issue 383 F.2d 883 (C.A. 8, 1967) ; and *Nat Harrison Associates, Inc.*, 42 T.C. 601, 617 (1964).

[14] The petitioners argue that since the settlement is expressed in a written agreement arrived at in an arm's-length transaction, the respondent, in order to change the settlement, must come forward with sufficient evidence to meet either the rule of proof required by *Commissioner* v. *Danielson*, 378 F.2d 771 (C.A. 3, 1967), reversing and remanding 44 T.C. 549 (1965), certiorari denied 389 U.S. 858 (1967), or the "strong proof rule." See *Schulz* v. *Commissioner*, 294 F.2d 52 (C.A. 9, 1961), affirming 34 T.C. 235 (1960). Again, we feel that petitioners' argument as to the burden of proof has little effect on our determination. However, we will address ourselves to this contention. In the present case, it is the respondent relying on the doctrine of substance over form who questions the validity of the agreement. The Court of Appeals in *Danielson*, in formulating its rule-of-proof doctrine, specifically excluded those cases in which the Commissioner attacks the formal agreement in order to examine the substance of the transaction. *Commissioner* v. *Danielson, supra* at 774. Furthermore, the requisite arm's-length status of the "strong proof rule" was not present in this case. The countervailing tax considerations present in such a situation do not appear on the overall facts of this case. Cf. *Schultz* v. *Commissioner, supra* at 55.

We cannot agree with the petitioners' view of the effect of the settlement. The note was being regularly paid off and there was a very good chance that the payments on the note would be continued until the note was entirely paid off. Section 166(a) provides that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. There is insufficient evidence to establish the worthlessness of the note in question at the time of settlement. Moreover, we have held that when there is a mutual agreement of settlement we must view all the considerations moving between the parties and when the agreement provides for the release of a debt for satisfactory consideration there is no support for a bad debt deduction. See *Northwest Equipment Co.*, 34 B.T.A. 371 (1936); *Blanche F. Davies*, 54 T.C. 170 (1970); and *First Nat. Bank & Trust Co.* v. *United States*, 115 F.2d 194 (C.A. 5, 1940). In our view, Mt. Elbert's and Mason's estate's release of any claim to the insurance money was integrally related to Twin Lakes' release of the debt and served as further consideration for the relase of the debt.[15]

Petitioners' alternative argument in which they rely on *West Coast Securities Co.*, 14 T.C. 947 (1950), and contend that they are entitled to a $63,974.28 deduction under section 165, is without merit. In that case, a liquidating corporation in need of cash in an arm's-length transaction canceled certain notes in exchange for immediate discounted payments. The Court allowed the corporation to deduct the amount lost because of the discount factor under section 165. In the *West Coast Securities* case, there was a measurable out-of-pocket loss in the amount of the deduction. Twin Lakes received bargained-for consideration for its settlement of the note and there was no loss to consider. The case at bar is therefore distinguishable.

On brief, respondent argued one additional new theory. Relying on *Grace R. Maxson Hall*, 12 T.C. 419 (1949), he contends that the settlement was an assignment by Mt. Elbert of its interest in the policy to Twin Lakes for a valuable consideration (Mt. Elbert's debt to Twin Lakes) and section 101(a)(2)[16] governs such a transaction. The effect

[15] If the fair market value of the note which would measure the value of what Twin Lakes received for cancellation of the note exceeded Twin Lakes' basis therein, its release of the debt may have resulted in the realization of income to the extent of this excess. See *United States* v. *Davis*, 370 U.S. 65 (1962). However, respondent has neither raised this issue nor has he introduced sufficient evidence that the note's fair market value exceeded its basis by any appreciable amount. Therefore, we express no opinion on this matter.

[16] SEC. 101. CERTAIN DEATH BENEFITS.
(a) PROCEEDS OF LIFE INSURANCE CONTRACTS PAYABLE BY REASON OF DEATH.—
* * * * * * *
(2) TRANSFER FOR VALUABLE CONSIDERATION.—In the case of a transfer for a valuable consideration, by assignment or otherwise, of a life insurance contract or any interest therein, the amount excluded from gross income by paragraph (1) shall not exceed an amount equal to the sum of the actual value of such consideration and the premiums and other amounts subsequently paid by the transferee. * * *

594

would be to treat Twin Lakes as having received taxable income to the extent the insurance proceeds exceeded Twin Lakes' adjusted basis in the debt owed it by Mt. Elbert.

This argument is without merit. As we previously stated, Twin Lakes was the owner and beneficiary of this policy; Mt. Elbert had no interest in the policy to assign.

*Decisions will be entered under Rule 50.*