T.C. Memo. 1997-83


UNITED STATES TAX COURT


ALTON W. BURNS AND PAMELA BURNS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21995-94.                    Filed February 19, 1997.


<u>Peter Ambelang</u>, for petitioners.

<u>Susan E. Seabrook</u>, for respondent.


MEMORANDUM OPINION


PAJAK, <u>Special Trial Judge</u>:  This case was heard pursuant to
section 7443A(b)(3) of the Code and Rules 180, 181, and 182.  All
section references are to the Internal Revenue Code in effect for
the year in issue.  All Rule references are to the Tax Court
Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' 1989 Federal income tax in the amount of $5,434, and an accuracy-related penalty under section 6662(a) in the amount of $689. After concessions by both parties, the Court must decide whether petitioners are entitled to a short-term capital loss carryover deduction for the year in issue.

Some of the facts have been stipulated and are so found. For clarity and convenience, our findings of fact and opinion have been combined. Petitioners resided in Mayer, Arizona, when their petition was filed.

On their 1989 Federal income tax return, petitioners claimed a short-term capital loss carryover deduction of $139,384. This carryover originated from a nonbusiness bad debt deduction of $205,029 petitioners claimed on the Schedule D attached to their 1985 Federal income tax return. Resolution of the 1989 deficiency depends upon the validity of the claimed bad debt deduction in a prior year. Sec. 6214(b).

On their 1985 return, Schedule D, petitioners originally claimed that the $205,029 nonbusiness bad debt deduction was for J. Riviera Boats, Inc (Riviera). Riviera was a business entity formerly owned and operated by petitioners. Petitioners now allege that the $205,029 bad debt deduction stems not just from Riviera, but also from Arizona Marine, another business entity formerly owned and operated by petitioners.

Riviera manufactured fiberglass boats. Petitioners incorporated Riviera on January 12, 1978. Petitioners were the 100-percent shareholders of Riviera. Petitioner husband was the president of Riviera, and petitioner wife was its vice president.

Petitioners initially invested $30,000 for the common stock of Riviera. Petitioners also initially "loaned" Riviera $42,809.03 represented by a promissory note. In return for advancing these funds, Riviera executed a 6-page security agreement on January 13, 1978, that granted petitioners, among other rights, a security interest in "all boats, motors, pumps, inventory, molds, equipment, tools, raw materials, work in process and accounts receivable".

By August 31, 1979, petitioners claim they had advanced Riviera an additional $44,755.81. Riviera and petitioners executed a total of $87,564.84 in promissory notes as of that date.

On October 9, 1979, in a document entitled "Action by Unanimous Written Consent of the Board of Directors", Riviera ratified the above-mentioned "borrowings" described in the security agreement and the promissory notes. On October 9, 1979, petitioners, in their individual capacities, sent a letter to Riviera demanding "payment of the total amounts due [$87,564.84] under the notes including interest not later than 10 days from receipt of this letter."

By a letter dated October 22, 1979, Riviera informed petitioners that:

> Due to a downturn in the economy, Riviera Boats of Arizona, Inc. is unable at this time to repay the loans evidenced by the promissory notes referred to in your letter of October 9, 1979.
> Although Riviera Boats fully intended to repay the amounts borrowed, an unfortunate series of events in the last months now makes it impossible to do so at this time. * * *

Petitioner husband signed this letter as president of Riviera.

By a letter dated October 24, 1979, petitioners informed Riviera that "Under the circumstances, we will have to assert our rights to take possession of the collateral that secured repayment of our loans to Riviera Boats." In a subsequent letter dated October 31, 1979, petitioners informed Riviera:

> We have assessed the value of the collateral and have decided to retain the collateral in satisfaction of the obligations owed by Riviera Boats of Arizona, Inc. to us. This letter shall constitute written notice of our proposal to retain the collateral in satisfaction of the debts owed us by Riviera Boats.

Petitioners did not introduce evidence of the specific property they received from Riviera in the October 1979 transaction. Petitioner husband testified generally that the collateral consisted of "[boat] molds, the inventory and all the equipment." Petitioner husband believed the value of the boat molds was equal to the value of the notes to Riviera. He also testified that the replacement cost of the molds was "probably two to $300,000 if you were buying what somebody else made. Because we made them, our labor was cheap. So basically all we

had was materials in the molds." Petitioners did not have the assets, including the boat molds, appraised or valued at the time of the exchange. However, on Riviera's Form 1120, U.S. Corporation Income Tax Return, for the year ending September 30, 1980, Riviera's assets were valued at $135,731.

Petitioners claim that Riviera was liquidated on October 31, 1979, the date they retained the collateral. The parties have stipulated that Riviera conducted no business from approximately September 30, 1980 to September 30, 1990. However, Federal corporate income tax returns continued to be filed for Riviera up until the year ending September 30, 1990. For the years ending September 30, 1980, September 30, 1981, September 30, 1982, September 30, 1983, and September 30, 1984, Riviera continued to claim depreciation deductions for office equipment on the corporate tax returns. Petitioner husband claimed the corporate tax returns continued to be filed for the following reason:

> We didn't file in each year, Your Honor. My attention
> was -- as we were shut down and that was the end of it,
> and then we didn't file any income tax returns after we
> shut down.
>     And then IRS wrote us a letter, so we went ahead
> and the accountant took the last return and filed it
> and sent them in. And at that time we thought maybe
> things could turn around and we could maybe start back
> up, which never happened. Things were improving, but
> it still didn't work out that way.

Riviera's Federal corporate income tax return for the year ending September 30, 1980, reflects the sum of $78,541 as shareholder loans from petitioners to Riviera, and $30,000 as

petitioners' Common Stock Investment.  As mentioned, the promissory notes from Riviera to petitioners indicate $87,564.84 of loans from petitioners to Riviera as of August 31, 1979. Petitioner husband could not explain this discrepancy. Petitioners have no records of amounts Riviera may have repaid to petitioners.

The second business entity petitioners allege to be related to their $205,029 bad debt deduction is Arizona Marine.  Arizona Marine was engaged in the repair and sale of recreational boats. In November 1977, petitioners sold Arizona Marine to Mr. and Mrs. Richard Reed.  The Purchase and Sale Agreement executed by petitioners and the Reeds provided that the Reeds purchased "all of the fixtures and equipment, inventory, goodwill, customer lists and relationships, leasehold rights", as well as all rights to the names "Arizona Marine", "Arizona Marine Boat and Motor Sales and Service", and "Arizona Marine Water Sports Center". The Purchase and Sale Agreement did not specifically assign a dollar value to each of these assets.  Rather, the agreement refers to these assets collectively as the "Business Assets", and states that the purchase price for the Business Assets is $202,110.

As part of the purchase, the Reeds executed a promissory note, payable to petitioners, in the amount of $133,866. Petitioner husband testified petitioners realized roughly a $30,000 profit on this sale.  Petitioner husband also testified

petitioners reported the gain from this sale under the installment method. Petitioners did not introduce into evidence a copy of their 1977 Federal income tax return.

In 1979, the Reeds sold their interest in Arizona Marine to Mr. and Mrs. Lee Lieberman. Petitioners agreed to the release of the Reeds from their obligations, and the substitution of the Liebermans. The Liebermans executed a promissory note dated October 1, 1979, in the amount of $117,464.48, payable to petitioners. The Liebermans also granted petitioners a security interest in certain inventory and equipment of Arizona Marine. The record does not disclose how petitioners treated this transaction on their 1979 Federal income tax return.

In 1980, the Liebermans defaulted under the promissory note and petitioners filed an action for injunction and forcible entry and detainer against Arizona Marine in the Superior Court of the State of Arizona, Maricopa County. At the time of default, the balance due on the promissory note was $112,334.25. The action was settled under the terms of a settlement agreement and an agreement relating to petitioners' lessor's lien and security interest in certain Arizona Marine property. The settlement agreement, entered into on May 9, 1980, provides:

> 3. [Arizona Marine] agrees to, contemporaneously with the surrender of the premises to Burns, also surrender to Burns the following:
>
> > (a) All of its inventory which consists of goods, merchandise and other personal property owned by [Arizona Marine] in connection with its

marine sales and service business but expressly does not include any boats, new outboard or inboard motors, new outdrive units or boat trailers.

(b)  All of the equipment used and owned by [Arizona Marine] in connection with its marine sales and service business, including but not limited to furnishings, fixtures, leasehold improvements, tools and other personal property.

* * * [Arizona Marine] makes no representation of value or amount of inventory or equipment and Burns expressly agrees to accept whatever is present at the premises at the date and time set forth in paragraph 1. * * *

* * * * * * *

5.  Burns acknowledges complete satisfaction of all remaining obligations due Alton W. and Pamela A. Burns under the Promissory Note * * *.

The agreement relating to petitioners' lessor's lien and security interest in certain Arizona Marine property, also entered into on May 9, 1980, provides:

[I]n consideration of payment from [Mr. Lieberman] to BURNS in the sum of Twenty Thousand Dollars ($20,000.00), the adequacy and receipt of which is hereby acknowledged, BURNS agrees as follows:

1.  BURNS releases any and all claims ALTON W. BURNS and PAMELA A. BURNS may have upon the collateral.

After repossession of Arizona Marine, petitioner husband testified that petitioners received roughly $15,000 of "inventory", in addition to the $20,000 settlement check from the Liebermans.  Petitioner husband also testified that petitioners paid their legal fees from the Arizona Marine transaction by signing over the $20,000 settlement check to their attorney, and paying approximately $3,000 to $4,000 out of their own pocket.

Petitioners did not introduce a copy of their 1980 Federal income tax return to show how they treated the Arizona Marine transaction.

Petitioners put "everything" they received from Arizona Marine and Riviera "in the same storage deal". Petitioner husband testified "I just figured I could probably sell it and get my money back." At some point, petitioners leased the molds to other boat builders. Eventually, petitioners got the molds back from the lessees.

In 1985, petitioners claimed the $205,029 nonbusiness bad debt deduction for the Arizona Marine and Riviera assets because petitioners "perceived no value in that stuff at all at that point in time." Petitioner husband further testified that in 1985, he came to the conclusion that:

> I was not going to get any money out of this equipment and there was two things that happened here, Your Honor. One is I had gone through an audit in like 1976 with the IRS. When the IRS got through with the audit, I ended up with a $32,000 tax credit and I had never used all that tax credit up. So when I shut [Riviera] down and Arizona Marine at the time, the losses, I mean, I couldn't use them. So in 1985 was the first time that I could even use any of these losses. So determining that there was no value to any of that equipment or stuff left, I went ahead and put it on my income tax in 1985.
>     Subsequent years in '86 and '87 I sold some of the stuff and, if you'll look at those tax returns, you'll see I reported the income I received from the sale of that equipment and molds.

Petitioners received $20,000 in 1986 and $25,000 in 1988 from these sales. Other than petitioner husband's general

testimony above, petitioners did not introduce evidence to identify the specific property sold on each of these dates, nor did they identify whether they sold the property from Riviera or Arizona Marine, or both, in each of these years.

On the Schedule D attached to their individual 1989 Federal income tax return, petitioners reported capital gains of $32,087. They claimed a short-term capital loss carryover of $139,384, which eliminated their capital gains for 1989. They then claimed a capital loss of $3,000 on line 13 of their 1989 Form 1040. Respondent determined that petitioners were not entitled to a short-term capital loss carryover of $139,384 because petitioners had failed to establish their entitlement to the bad debt deduction they claimed in a prior year. Respondent correspondingly adjusted petitioners' 1989 income to include $35,087 of capital gains.

Respondent's determinations in the statutory notice of deficiency are presumed correct. Petitioners bear the burden to prove error in those determinations. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

With respect to the $205,029 bad debt deduction, petitioners now concede that "such loss was not incurred in 1985 and that the amount claimed is not correct. The actual loss was incurred in 1979, 1980, 1986 and/or 1988." Petitioners ask that the Court go back to the years 1979, 1980, 1985, 1986 and/or 1988 to calculate any loss they may have suffered in those years, so they may carry

forward that loss to 1989. They argue that if a capital loss were incurred in those years "which exceeded the current capital gains and other application of capital losses during the period from 1979 to 1988, the capital loss carryover created would be capable of being carried into 1989 and offset the reported gain."

Petitioners are unclear about whether they are seeking a bad debt deduction under the provisions of section 166, a loss deduction under the provisions of section 165, or both with respect to the Riviera and the Arizona Marine transactions. In their trial memorandum, petitioners cite section 166(a), which allows a deduction for a debt that becomes worthless within a taxable year. They also cite section 165(g), which allows a deduction for a security which becomes worthless during a taxable year. On brief after trial, petitioners argue "there is little significance to whether the loss constituted a short-term capital loss under § 166(d)(1)(B) IRC or a long term capital loss as described under § 1201 et.seq. IRC." They cite no other code sections throughout their brief and reply brief.

The separate statutory provisions regarding losses and bad debts are mutually exclusive. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 189 (1934). Therefore, if a loss has been sustained, the taxpayer may not deduct it as a bad debt. Moreover, deductions are not a matter of right but of legislative grace. The burden is on the taxpayer to bring the case squarely

within the precise terms of the statute. <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934).

To be entitled to a deduction for a loss or a bad debt for any taxable year, petitioners must establish that their transaction fits within the parameters of section 165 or section 166. Section 165 allows a deduction for any loss sustained by a taxpayer which is not compensated by insurance or otherwise. In the case of individuals, this deduction is limited to losses incurred in a trade or business, losses incurred in a for-profit transaction, and casualty or theft losses. Sec. 165(a), (c). The adjusted basis for the loss deduction is determined under section 1011. A loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year. Sec. 1.165-1(b), Income Tax Regs.

The amount of loss allowable under section 165 shall not exceed the taxpayer's basis in the asset. <u>Fisher v. Commissioner</u>, T.C. Memo. 1986-141; sec. 1.165-1(c), Income Tax Regs. The taxpayer bears the burden of proving the amount of the taxpayer's basis in the asset. <u>Millsap v. Commissioner</u>, 46 T.C. 751, 760 (1966), affd. 387 F.2d 420 (8th Cir. 1968). A loss cannot be computed where the taxpayer's basis in the property is not proven. <u>Fisher v. Commissioner</u>, <u>supra</u>.

As mentioned, petitioners now concede that 1985 was not the proper year to claim the $205,029 deduction. With respect to the

Riviera transactions, the disposition of the alleged notes occurred on October 31, 1979. The transactions relating to Arizona Marine occurred on May 9, 1980. The losses suffered, if any, would have been required to be reported on either petitioners' 1979 or 1980 Federal income tax returns. The record does not contain these returns. Accordingly, it is unclear how petitioners treated these transactions on their returns.

In order to claim either of these alleged losses, petitioners were required to establish the amount of that loss by reference to their adjusted bases in the assets. Because we find that petitioners did not establish their bases, the amount of their losses, if any, cannot be computed. Sec. 165(b); Millsap v. Commissioner, supra; Fisher v. Commissioner, supra. Although nothing further need be said in light of these findings, we address some of petitioners' contentions below.

Petitioners suggest that section 166 might apply to the transactions at issue. In general, section 166(a) allows a deduction for a debt which become worthless during the taxable year. To be entitled to the deduction, the taxpayer must prove the existence of a bona fide debtor-creditor relationship which obligates the debtor to pay the taxpayer a fixed or determinable sum of money. A contribution to capital cannot be considered debt. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 284 (1990); sec. 1.166-1(c), Income Tax Regs. The loss on the worthlessness of a nonbusiness bad debt is deductible only as a

short-term capital loss. Sec. 166(d). The amount of an allowable bad debt deduction is governed by the adjusted basis of the debt as determined under section 1011. Sec. 166(b).

Petitioners apparently concede that their advances to Riviera were contributions to capital, rather than loans from petitioners to Riviera. Our own review of the record leads us to believe that the advances were in fact contributions to capital, rather than loans. As the Court stated in Calumet Indus., Inc. v. Commissioner, supra at 287, "We find that as an economic reality the advances in the instant case were placed at the risk of the business of the company and that it is unlikely that disinterested investors would have made loans * * * on terms similar to those on which the advances were made." Accordingly, we do not consider section 166 applicable to the Riviera transactions.

With respect to Arizona Marine, this Court has long held that where there is a mutual agreement of settlement and the agreement provides for the release of a debt for satisfactory consideration, a bad debt deduction is not allowed. Harrison v. Commissioner, 59 T.C. 578, 593 (1973); Northwest Equip. Co. v. Commissioner, 34 B.T.A. 371 (1936). Aside from all else, we find that the Arizona Marine obligation was released by petitioners in exchange for satisfactory consideration in the form of money and property. Therefore, this transaction does not entitle petitioners to a bad debt deduction.

Petitioners raised the possibility that section 165(g) applies to the Riviera transaction. Section 165(g) provides that if any security which is a capital asset becomes worthless during the taxable year, the resulting loss shall be treated as a loss from the sale or exchange of a capital asset. To be able to deduct such losses, the petitioners must show: That the losses were incurred; when the losses were incurred; that petitioners are entitled to deduct such losses; whether the losses were capital or noncapital, or business or personal; and, the amount of capital gain during the intervening years, in order to compute any allowable carryforward. Aazami v. Commissioner, T.C. Memo. 1993-436. Petitioners have not met these criteria. Thus, we hold they are not entitled to claim a loss under section 165(g).

We further consider petitioners' reliance on section 6214 to make the argument that they are entitled to currently claim losses that may have occurred in prior years. In pertinent part, section 6214(b) provides as follows:

> The Tax Court in redetermining a deficiency of income tax for any taxable year * * * shall consider such facts with relation to the taxes for other years * * * as may be necessary correctly to redetermine the amount of such deficiency * * *

A taxpayer's failure to claim capital losses in prior years does not necessarily result in the disallowance of deductions in subsequent years. Lang v. Commissioner, T.C. Memo. 1983-318. However, the amount of any carryover loss is reduced in accordance with section 1212(b), regardless of whether a

deduction was taken in a prior year.  Petitioners also bear the burden to prove that the losses have not been previously absorbed.  <u>Williams v. Commissioner</u>, T.C. Memo. 1991-317, affd. without published opinion 996 F.2d 1230 (9th Cir. 1993).  When a deduction is carried forward from one year to the next, the taxpayer must keep records to substantiate the amount that is carried forward.  Sec. 1.6001-1(e), Income Tax Regs.

In the instant case, petitioners cannot show conclusively that the losses, if any, would not have been previously absorbed. The pertinent transactions occurred as of October 31, 1979 (Riviera), and May 9, 1980 (Arizona Marine).  Without access to petitioners' Federal income tax returns or the relevant return information for tax years 1979 and 1980, we find that it is impossible to determine whether or not the losses were absorbed.

Based on the foregoing, we must conclude that petitioners failed to carry their burden of proving that deductible losses were suffered on the Riviera and Arizona Marine transactions. Petitioners have not offered sufficient evidence to prove their bases in the assets they received from those transactions. Additionally, we find that they failed to carry their burden of proving that any losses would not have been fully absorbed prior to the year in question.  With respect to these issues, we have considered all arguments made by petitioners, and, to the extent not addressed above, find them to be without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.